IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.  08 CV 7192 (DC) (DFE) |
| ROBERT H. HURLBUT, et al., | ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF DAVID DWORTZ

I, David Dwortz, declare as follows:

1.      I am Senior Vice President & General Manager New York Division, Business Markets.  I have overall responsibility for the direct sales force, underwriting, and service operations for Liberty Mutual Business Markets in New York.

2.      I have personal knowledge of the matters addressed in this declaration.  As the New York Division General Manager, I meet with current and former policyholders to discuss issues important to their businesses, including what they value most in an insurance carrier and the reasons for either continuing their business with Liberty Mutual or deciding to move their business.

3.      Plaintiffs are all affiliates of Liberty Mutual Insurance Company, one of the largest writers of workers' compensation insurance in New York and nationally.  Plaintiffs have been underwriting workers' compensation insurance in New York for approximately 94 years. Currently, plaintiffs have approximately a 9% share of the New York workers' compensation market.

4.    Worker's compensation insurance is a contract between an insurer and an employer. The employer agrees to pay a premium and to perform other contractual obligations. In return, the insurer assumes the risk of paying the benefits to injured workers required by New York's Workers' Compensation Law ("WCL").

5.    Different types of policies shift different amounts of risk to an insurer. "Large deductible" policies leave employers responsible for claims up to a relatively high level. The employer pays lower premiums but remains protected against significant losses. Many large employers prefer large deductible policies.

6.    Employers have three options for funding their workers' compensation liabilities: they can purchase from a private insurer such as Liberty Mutual; they can purchase from the NYSIF; or they can self-insure. NYSIF is the largest insurer in New York and Liberty Mutual's principal competitor. Self insurance means that the employer assumes all the risk of paying compensation. Self-insurance is thus a product that competes with insurance coverage provided by private carriers, such as Liberty Mutual. Employers can self-insure individually or join "group self-insurance trusts" consisting of multiple employers. WCL § 50(3-a).

7.    The NYSIF also administers the Aggregate Trust Fund ("ATF"), into which insurers are required to deposit the present value of benefits awarded for certain types of claims. Prior to 2007, insurers were required to deposit the present value of death benefits, benefits for permanent total disability, and benefits for "schedule" permanent partial disabilities involving the loss of a limb or eye. These are called "schedule" disabilities because the WCL sets forth schedules for the payment of benefits for these types of injury. WCL § 15(3). Insurers were not required make deposits for non-schedule or "classified" permanent partial disabilities. These are

called "classified" disabilities because the WCB determines into which classification the injury falls, which governs the amount and time period of compensation. *Id.*

8.     The Workers' Compensation Reform Act of 2007 amended various WCL provisions (the "2007 Amendments"), including the ATF deposit requirement. The amended law now requires insurers to deposit the present value of workers' compensation benefits for all types of "classified" permanent partial disability claims. WCL § 27. Non-schedule permanent partial disabilities are more serious types of injuries than schedule disabilities. They therefore involve a far larger amount of benefits. Insurers must make the deposits after the WCB makes an "award" of compensation on a claim. *Id.*

9.     The 2007 Amendments also prevent the insurer from handling claims and entering into settlements with claimants after a deposit has been made to the ATF. Once the deposit is made, the ATF handles the claim and has exclusive authority to settle claims against the insurer. WCL § 32. If the ATF settles for less than the full amount of the claim, it keeps the remainder. *Id.* § 27(8). Prior to the 2007 Amendments, the insurer was entitled to a refund. The ATF charges insurers a fee for claims handling, which currently is set at 3% of the deposit.

10.    The 2007 Amendments will have three substantial cost impacts on Liberty Mutual. First, the loss of its settlement authority will drive up losses. Approximately 20% of permanent partial disability claims are settled significantly below the full value of the claim. Therefore, the inability to settle once a deposit has been made with the ATF means that Liberty Mutual or its customer must pay the full value of the claim rather than a substantially lesser amount.

11.    Second, the ATF calculates the present value of the deposit the insurer must make using a discount rate lower than the rate of return Liberty Mutual could earn if it invested the

premiums and paid out benefits over time. Third, the ATF's claims handling fee exceeds Liberty Mutual's costs of handling the claim by itself.

12.    All three factors will increase the rates Liberty Mutual must charge to cover its losses and expenses. Workers' compensation insurance rates are calculated to cover the losses and expenses the insurer anticipates during the future time period when the policy is in effect. As a result, Liberty Mutual must factor these additional losses and expenses caused by the 2007 Amendments into its rate calculations.

13.    The 2007 Amendments will put Liberty Mutual at a competitive disadvantage to the NYSIF and self-insurance in three respects. First, the expanded deposit requirement and the ATF's settlement authority is only applicable to private insurers, not to the NYSIF or self-insured employers. As a result, the additional losses and expenses the 2007 Amendments impose on Liberty Mutual will place it at a significant cost disadvantage compared to the NYSIF and self-insurance.

14.    The market for workers' compensation is extremely price sensitive. Small changes in price can cause an employer to switch carriers or choose to self-insure. As a result, the increased cost of Liberty Mutual's workers' compensation insurance is very likely to cause a significant number of customers to take their business to the NYSIF or to self-insure.

15.    Second, one of Liberty Mutual's competitive advantages over the NYSIF is that it sells large deductible policies that the NYSIF does not. Employers must secure their deductibles by maintaining loss funds in an escrow account and replenishing them as they are depleted. Prior to the expanded deposit requirement, benefits were paid out on a weekly basis for many years and thus the employer's replenishment of the escrow account was similarly stretched out. Now, however, claims that fall within the deductible will require immediate, lump-sum deposits

to the ATF that will require large payments into the escrow account. This will adversely affect the anticipated cash flows of large deductible policyholders. The same claims will not require a lump-sum deposit if the employer self-insures or insures with the NSYIF. The difference is likely to cause customers to turn to the NYSIF or self-insurance.

16.     Third, the 2007 Amendments will severely compromise Liberty Mutual's ability to offer the unique claims handling service that differentiates it from its competitors and allows it to attract and retain customers. Because the Department of Insurance sets uniform rates for private insurers, private insurers are largely unable to compete on the basis of price with the NYSIF and self-insurance. Instead, they compete on the basis of their services, of which claims handling is critically important. As a large insurer with long and extensive experience, Liberty Mutual's claims handling service is a major reason why employers turn to it rather than the NYSIF or self-insurance.

17.     Liberty Mutual claims services are extremely valuable to its large deductible customers. Those customers are funding the payments on the great majority of claims and thus retaining almost all of the financial risk. Consequently, they come to Liberty Mutual not for its assumption of risk but for its claims handling. Moreover, large deductible policies are usually purchased by companies that are large enough to absorb risk themselves and thus tend to be Liberty Mutual's largest clients.

18.     As described above, the 2007 Amendments transfer control over the handling of claims from the insurer to the ATF once a deposit is made. Thus, Liberty Mutual's ability to offer claims handling service is considerably reduced and has much less value as a selling point to retain and obtain business, especially the largest and most valuable clients.

19.    Liberty Mutual 's reputation for good and efficient claims handling not only allows it to attract customers but also maintains goodwill among current customers. That reputation will be harmed if the ATF takes over claims handling.

20.    The effect of the 2007 Amendments may spill over into other lines of business. Liberty Mutual usually provides multiple types of insurance policies for its clients – such as a package of commercial general liability, commercial auto, property and workers' compensation coverage – and can offer better pricing because of the ability to spread risk over a wider range of business from each customer. Therefore, those customers that switch to NYSIF or self-insurance may face higher rates on the remaining coverages.

21.    Liberty Mutual has not yet suffered the loss of customers and harm to reputation described above but faces the imminent threat of such injury. After enactment of the 2007 Amendments to §§ 27 and 32 of the WCL, the Governor supported repeal of those changes. A copy of the repeal bill, Senate Bill 8718 (June 24, 2008), is attached to this declaration as Exhibit 1. Liberty Mutual refrained from filing this action in the hopes that the repeal legislation would be enacted and make a lawsuit unnecessary.

22.    However, the New York legislature adjourned on June 24, 2008, without enacting Senate Bill 8718. I have been informed that the Chairman of the WCB recently met with the WCB's Workers' Compensation Law Judges with respect to processing of permanent partial disability claims covered by the 2007 Amendments and has begun making awards. Once an award on a claim against Liberty Mutual is made, the company is required to make the deposit promptly. Therefore, Liberty Mutual faces the types of injuries I have described above.

- 6 -

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 6, 2008.

David Dwortz

# EXHIBIT 1

# STATE OF NEW YORK

8718

# IN SENATE

June 24, 2008

Introduced by COMMITTEE ON RULES -- (at request of the Governor) -- read twice and ordered printed, and when printed to be committed to the Committee on Rules

AN ACT to amend the labor law, in relation to increasing the maximum benefit rate for unemployment insurance and improving the financing structure for unemployment insurance, and to amend the workers' compensation law, in relation to the aggregate trust fund

**The People of the State of New York, represented in Senate and Assembly, do enact as follows:**

1    Section 1. Paragraph (a) of subdivision 1 of section 518 of the labor
2 law, as amended by chapter 589 of the laws of 1998, is amended to read
3 as follows:
4    (a) "Wages" means all remuneration paid, except that such term does
5 not include remuneration paid to an employee by an employer after [eight
6 ~~thousand five hundred~~] _nine thousand seven hundred fifty_ dollars have
7 been paid to such employee by such employer with respect to employment
8 during any calendar year _on or after the first day of January, two thou-_
9 _sand nine, nor include remuneration paid to an employee by an employer_
10 _after eleven thousand five hundred dollars have been paid to such_
11 _employee by such employer with respect to employment during any calendar_
12 _year on or after the first day of January, two thousand ten, nor include_
13 _remuneration paid to an employee by an employer after thirteen thousand_
14 _dollars have been paid to such employee by such employer with respect to_
15 _employment during any calendar year on or after the first day of Janu-_
16 _ary, two thousand eleven. In each succeeding calendar year, the depart-_
17 _ment shall calculate the base amount of remuneration necessary from_
18 _which to produce sufficient premium to provide for the annual increases_
19 _in maximum weekly benefit provided for in this article, and other fund-_
20 _ing for the unemployment insurance trust fund pursuant to section five_
21 _hundred fifty of this article, as may be necessary._ The term "employ-
22 ment" includes for the purposes of this subdivision services constitut-
23 ing employment under any unemployment compensation law of another state
24 or the United States.

EXPLANATION--Matter in **_italics_** (underscored) is new; matter in brackets [--] is old law to be omitted.

LBD12095-02-8

S. 8718                                2

```
 1    § 2.  Subdivision 5 of  section 590 of the labor law, as amended by
 2  chapter 413 of the laws of 2003, is amended to read as follows:
 3    5.   Benefit  rate.  A  claimant's  weekly benefit amount shall be one
 4  twenty-sixth of the remuneration paid during the highest calendar  quar-
 5  ter  of  the  base  period  by  employers,  liable  for contributions or
 6  payments in lieu of  contributions  under  this article. However,  for
 7  claimants whose high calendar quarter remuneration during the base peri-
 8  od  is  three  thousand  five  hundred seventy-five dollars or less, the
 9  benefit amount shall be one twenty-fifth of the remuneration paid during
10  the highest calendar quarter of the base period by employers liable  for
11  contributions  or  payments in lieu of contributions under this article.
12  Any claimant whose high calendar quarter remuneration  during  the  base
13  period  is  more  than  three thousand five hundred seventy-five dollars
14  shall not have a weekly benefit amount less than one hundred forty-three
15  dollars. The weekly benefit amount, so computed, that is not a  multiple
16  of  one dollar shall be [lowered to] the next multiple of one dollar. On
17  the first Monday of September, nineteen hundred ninety-eight  the  weekly
18  benefit  amount shall not exceed three hundred sixty-five dollars nor be
19  less than forty dollars, until the first Monday of September, two  thou-
20  sand,  at which time the maximum benefit payable pursuant to this subdi-
21  vision shall equal one-half of the state average weekly wage for covered
22  employment as calculated by the department no sooner  than  July  first,
23  two  thousand  and  no  later  than  August first, two thousand, rounded
24  [down] to the [lowest] next dollar.  On January  first,  two  thousand
25  nine, the  weekly benefit  shall  not exceed four hundred seventy-five
26  dollars nor less than seventy-five dollars, until  January  first,  two
27  thousand  ten  at  which  time  the weekly benefit shall not exceed five
28  hundred fifty dollars, until January  first,  two  thousand eleven  and
29  January  first of each succeeding year until January first, two thousand
30  thirteen, the maximum benefit shall equal one half of the state  average
31  weekly  wage  as  calculated  by the department annually pursuant to the
32  manner described in this subdivision.  On or after January  second,  two
33  thousand  thirteen  and  thereafter, the maximum benefit shall equal the
34  amount calculated by the department on January first, two thousand thir-
35  teen.
36    § 3. Subdivision 2 of section 27 of the workers' compensation law,  as
37  amended by chapter 6 of the laws of 2007, is amended to read as follows:
38    2.  If  an award under this chapter requires payment of death benefits
39  or other compensation by an insurance carrier or employer in  periodical
40  payments,  the  board may, in its discretion, at any time, any provision
41  of this chapter to the contrary notwithstanding, compute and permit  or
42  require  to be paid into the aggregate trust fund an amount equal to the
43  present value of all unpaid death  benefits  or  other  compensation  in
44  cases  in which awards are made for total permanent or permanent partial
45  disability for a period of one hundred and four weeks or more, for which
46  liability exists, together with such additional sum as  the  board  may
47  deem  necessary for a proportionate payment of expenses of administering
48  the fund so created, including the cost of the actuarial computation  by
49  or on behalf of the board of the present value of the award, and for the
50  purposes of this section such cases shall be known as discretionary type
51  cases.  If  any such award made on or after July first, nineteen hundred
52  thirty-five, requires payment for total permanent  disability  resulting
53  from  the  loss of both hands, or both arms, or both feet, or both legs,
54  or both eyes, or of any two thereof, or for permanent partial disability
55  resulting from loss of an arm, leg, hand, foot or eye, or of death bene-
56  fits by an insurance carrier which is a  stock  corporation  or  mutual
```

S. 8718                                    3

1  association, [or if any such award made on or after July first, two
2  thousand seven requires payment for permanent partial disability under
3  paragraph w of subdivision three of section fifteen of this article by
4  an insurance carrier which is a stock corporation or mutual associ-
5  ation,] which for the purposes of this section shall be known as manda-
6  tory  type  cases, the board shall immediately compute the present value
7  thereof and require payment of such  amount  into  the  aggregate  trust
8  fund,  together with such additional sum as the board may deem necessary
9  for a proportionate payment of expenses of administering such trust fund
10 including the cost of the actuarial computation by or on behalf  of  the
11 board of the present value of the award provided, however, that where an
12 employer  or his insurance carrier is found to be entitled to reimburse-
13 ment from the special disability fund of subdivision  eight  of  section
14 fifteen,  the  computation  of  the  present  value of the award and the
15 requirement for payment of such amount into the said trust  fund  shall
16 not be mandatory and such cases shall be deemed to be discretionary type
17 cases;  further provided that where an employee entitled to compensation
18 under this chapter be injured or killed by the negligence  or  wrong  of
19 another not in the same employ, the computation of the present value and
20 the   requirement  for  payment  of  such amount into the said trust fund
21 shall be held in abeyance until (1) six months  have  elapsed  from  the
22 award  of compensation, or in any event not more than one year after the
23 date of the accident, if the injured employee, or in case of death,  his
24 personal representatives, spouse, parents, dependents or next of kin, or
25 anyone otherwise entitled to recover damages at common law or otherwise,
26 on account of such injury or death, have failed to commence such action,
27 (2)  the termination of any such action brought by the injured employee,
28 or in case of death,  his  personal  representatives,  spouse,  parents,
29 dependents  or  next  of  kin,  or  anyone otherwise entitled to recover
30 damages, at common law or otherwise, on account of such injury or death,
31 under the provisions of section twenty-nine of this article.
32   § 4. This act shall take effect January 1,  2009;  provided,  however,
33 that  section three of this act shall take effect immediately, and shall
34 be deemed to have been in full force and effect on  and  after  July  1,
35 2007.

**NEW YORK STATE SENATE**
**INTRODUCER'S MEMORANDUM IN SUPPORT**
**submitted in accordance with Senate Rule VI. Sec 1**

BILL NUMBER: S8718

SPONSOR: RULES

TITLE OF BILL:

An act to amend the labor law, in relation to increasing the maximum
benefit rate for unemployment insurance and improving the financing
structure for unemployment insurance, and to amend the workers' compen-
sation law, in relation to the aggregate trust fund

PURPOSE:

This bill: (1) raises the taxable wage base of each employee for
purposes of determining the unemployment tax owed on behalf of that
employee; (2) raises the maximum benefit for unemployment insurance over
time to half of the average weekly wage in 2013, and then fixes it at
that amount thereafter; and (3) repeals the requirement of the Workers'
Compensation Law (WCL) that permanent partial disability awards be
deposited into the Aggregate Trust Fund (ATF).

SUMMARY OF PROVISIONS::

Section 1 of the bill amends Labor Law § 518(1)(a) to effect a graduated
increase in the amount of an employee's wages that may be considered in
the calculation of unemployment taxes. The amount will increase gradual-
ly from the present total of $8,500 to $9,750 in 2009, to $11,500 on
2010, and to $13,000 in 2011, and thereafter will be set at the amount
necessary for the fund to pay the maximum benefit and other necessary
expenses.

Section 2 of the bill amends Labor Law § 590(5) raises the maximum bene-
fit received by an unemployed individual gradually from $405 at present,
to $475 in 2009, to $550 in 2010 and thereafter to half the average
weekly wage until 2013, when the amount will be fixed.

Section 3 of the bill amends WCL § 27(2) to repeal the requirement that
permanent partial disability awards be deposited into the ATF.

Section 4 of the bill sets an effective date of 2009, except as to
section 3, which is effective immediately and shall be deemed in full
force and effect as of July 1, 2007.

EXISTING LAW:
Labor Law § 518(1)(a) sets the taxable wage base for each employee, for
purposes of calculating unemployment tax, at $8,500. Labor Law § 590(5)
sets the maximum weekly benefit at $365. WCI § 27(2) requires deposit of
permanent partial disability awards into the Aggregate Trust Fund.

**STATEMENT IN SUPPORT:**
This bill addresses three important matters in the labor and Workers'
Compensation laws in New York State.
First, the bill raises the maximum amount of remuneration that may be
considered in determining the unemployment tax owed on behalf of any
employee, ultimately allowing the Department of labor to set that amount
as necessary to insure funding of the Unemployment Insurance Trust Fund.
Increasing this rate will make the unemployment tax more progressive,
and will protect against depletion of the fund, which requires unneces-
sary borrowing and a surcharge on employers.
Second, this bill raises the maximum benefit for unemployment insurance
to $475 in 2009, $550 in 2010, and thereafter half the average weekly
wage until 2013, when the amount will be fixed. Such benefits have not
been increased since 2000, and their value in real terms has greatly
diminished as a result. This bill will insure that, in the present
recessionary climate, workers who lose their jobs do not fall into
poverty, and retain sufficient purchasing power to sustain the economic
life of their communities.
Third, the bill repeals a provision of the Workers' Compensation law
that requires that the present value of permanent partial disability
awards be deposited into the ATF. Significant concerns have been
expressed that this provision will deprive carriers of investment
income, distort incentives, create pressure for settlements of unwar-
ranted value, and raise workers' compensation rates.

**BUDGET IMPLICATIONS:**
There will be a limited impact on the State financial plan as a result
of the State's expenses for unemployment benefits for its employees.

**EFFECTIVE DATE:**
This bill takes effect immediately, except that section three of the
bill will be deemed to have been in full force and effect on July 1,
2007.