**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

LIBERTY MUTUAL INSURANCE )
COMPANY, *et al.,* )
         )
        **Plaintiffs,** )
         )
        **v.** )    **Civil Action No.** _08 CV 7192_ (DC) (DFE)
         )
ROBERT H. HURLBUT, *et al.,* )
         )
        **Defendants.** )
         )

## DECLARATION OF JAMES HALL

I, James Hall, declare as follows:

1.    I am the claims manager of the Syracuse Business Markets office for plaintiff

Liberty Mutual Insurance Company ("Liberty Mutual"). I supervise all claims adjusters and

other personnel who administer claims by injured workers in New York for compensation under

Liberty Mutual's workers' compensation insurance policies. I verify we are investigating in a

timely manner, making proper compensability decisions, and making payment and settling

claims wherever possible. I make this declaration in support of Liberty Mutual's motion for a

preliminary injunction.

2.    I have been involved in the handling of Liberty Mutual's workers' compensation

insurance claims for 35 years. I have substantial familiarity with Liberty Mutual's workers'

compensation insurance policies and how claims arising under those policies are handled in New

York. Because workers' compensation insurance coverage is based on the compensation

required under the workers' compensation law, and because claims are governed by and

adjudicated under that law, I also have extensive knowledge of New York's Workers'

Compensation Law ("WCL"). This includes knowledge arising from my extensive experience with the Aggregate Trust Fund ("ATF") and Workers' Compensation Board ("WCB").

### New York's Workers' Compensation Law

3.     The WCL governs compensation to employees who suffer a "personal injury by accident arising out of and in the course of employment" or an occupational disease. WCL §§ 2(7), 3(2). The WCL replaced the prior tort law system, under which the employee had to prove the employer's negligence, with a "no fault" regime. The employer is strictly liable for compensation regardless of whether it was at fault and regardless of the employee's contributory negligence.

4.     There are three categories of benefits paid to injured workers or their survivors: (1) indemnity benefits for lost wages; (2) medical benefits for the costs of medical treatment and rehabilitation; and (3) death benefits when the worker has died. WCL §§ 13, 14, 16. These benefits are the exclusive remedy against the employer for the injured employee and his or her family. WCL § 11.

5.     Indemnity benefits generally are two-thirds of the employee's average weekly wage, computed under statutory formulas up to a cap. WCL § 15. There are four principal categories of disabilities that govern the time period during which indemnity benefits must be paid: (1) permanent total disability; (2) permanent partial disability; (3) temporary total disability; and (4) temporary partial disability. WCL § 15.

6.     Benefits for permanent partial disabilities ("PPDs") are divided into two subcategories: (1) so-called "schedule awards" where, for various specified types of injury, statutory schedules set forth the number of weeks during which compensation must be paid; and (2) "non-schedule" or "classified" awards where the injury is not one of those specified in the

- 2 -

statutory schedules and where the level of benefits depends on the "classification" of the injury. WCL § 15.

7.     An injured worker is required to report an injury to his or her employer within 30 days of the occurrence with some exceptions. WCL § 18. The employee must then make a claim for workers' compensation within two years after the date of injury. WCL § 28. If the employer is insured, it is responsible for notifying the insurer of the employee's injury report and claim.

8.     If the claim is one for permanent partial disability, the WCB must then determine whether it is a "schedule" or "classified" claim and, if the latter, determine into which classification the injury falls. This governs the amount of compensation. During the time period before classification, the insurer pays indemnity benefits of two-thirds the former average weekly wage times the percentage of disability.

9.     Upon receipt of a claim, the insurer investigates it and determines whether the claim is eligible for compensation or is ineligible and therefore should be disputed. If a claim is controverted the insurer notifies the injured worker of the reasons for the dispute. It also notifies the customer and WCB. During the pendency of the claim the injured worker may apply for statutory New York disability. This is a benefit similar to short term disability for non-work-related injuries. There is a cap of 26 weeks of benefits. If the employee receives this and is successful in his or her claim for workers' compensation indemnity benefits, the disability benefits carrier has a lien and is repaid.

10.    If the insurer disputes a claim, it is adjudicated by a Workers' Compensation Law Judge with the right of appeal to a 3-member panel of the WCB and thereafter to the Appellate

Division of the Supreme Court, Third Department. WCL §§ 23, 118. If the claimant is eligible

for benefits, the Law Judge or the WCB makes an "award" of compensation. WCL § 20.

### Workers' Compensation Insurance

11.    Employers are required to secure the payment of compensation benefits to their

employees either through the purchase of insurance or through qualification as a self-insurer.

WCL § 50. Workers' compensation insurance policies, like other kinds of insurance, are

contracts. The Liberty Mutual policy states that it "is a contract of insurance between you (the

employer named in item 1 of the Information Page) and us (the insurer named on the information

page.") See Exhibit 1 attached hereto. The insurer contractually assumes the risk that the

employer must pay compensation to injured employees.

12.    In return for the insurer's assumption of risk, the employer agrees to pay a

premium. Premiums are calculated based on rates. Workers' compensation insurance

ratemaking is done on a prospective basis. The insurer calculates rates so that, for the particular

type of risk, they will be adequate to cover the losses and expenses the insurer anticipates during

the future time period when the policies will be in effect. The insurer's expectations at the time

of contracting thus determine rate levels.

13.    The premium is calculated using premium rates that consist of three elements.

"Pure premium," the largest component, is calculated by the insurer based on the losses –

payment of benefits, defense costs and expenses of adjusting claims – that the insurer anticipates

it will incur during the time period when the policy is in effect. Pure premium is based on the

occupational classes of the various types of employees working for the insured employer. The

amount of pure premium is calculated by multiplying the rate times the dollar value of the

payroll for the particular occupational class. The pure premium can then be adjusted based on the prior loss experience of the employer together with other debits or credits.

14.    The "expense factor" or the "expense loading factor" is the component of premium calculated by the insurer to cover the anticipated expenses of underwriting and administering the policy. The insurer also uses a profit factor designed to earn a reasonable profit on the underwriting of the policy.

15.    The policy may include an endorsement specifying a "deductible" – covering a bottom layer of the claim that the employer must pay before the insurance coverage kicks in. Approximately 20 percent of Liberty Mutual's New York insureds buy "large deductible" policies that set the deductible at a high level. This is often attractive because the insurer's reduced exposure allows it to charge a lower premium but the employer still has insurance coverage for high magnitude losses. Usually, only the largest employers are willing to retain the significant risk required under large deductible policies.

16.    The contract also gives the insurer rights and imposes obligations with regard to its handling of claims. The insurer has the exclusive authority to investigate the claim to determine whether it is covered by the policy, subject to resolution of disputes through the WCB adjudication process. The insurer also has the exclusive right to negotiate settlements. This right is fundamental to the insurance contract because it allows the insurer to resolve the claims that are its most basic contractual obligation.

**Regulation of Workers' Compensation Insurance**

17.    New York protects workers' compensation claimants against insurer insolvency in three ways. First, the Department of Insurance imposes a number of solvency requirements on insurers. It requires insurers to have sufficient capital and surplus to meet their policy

obligations. N.Y Ins. Law § 1303. The Department also controls the types of assets in which insurers may invest. N.Y. Ins. Law Art. 14. Insurers must submit annual and other periodic reports on their financial condition. N.Y. Ins. Law §§ 307-308. The Department has broad power to conduct examinations of an insurer's financial condition. N.Y. Ins. Law § 309. The Department is not required to wait until an insurer is actually insolvent before taking remedial action. It can order an insurer in impaired financial condition to take corrective action. N.Y. Ins. Law §§ 1310-1311. Self-insured employers are not subject to the same type of regulation.

18. The Department also regulates workers' compensation insurance rates to ensure they are adequate to pay claims. Rates are subject to the approval of the Department. The standard for approval is that rates must not "be excessive, inadequate, unfairly discriminatory, destructive of competition or detrimental to the solvency of insurers." N.Y. Ins. Law § 2303.

19. If an insurer nevertheless becomes insolvent, injured workers are protected by the Workers' Compensation Security Fund ("Security Fund"). WCL § 106. The Security Fund pays awards of compensation in the event of default by an insolvent carrier.

20. The Security Fund is financed by assessments on workers' compensation insurers, all of which are required to participate in the Fund. WCL § 108. There is a regular annual assessment that is designed to amass reserves sufficient to pay claims in the event of insolvency. If those amounts are insufficient, then insurers can be assessed in an additional amount after the insolvency.

### Aggregate Trust Fund

21. When the Workers' Compensation Law was enacted in 1914, there was no Security Fund to protect claimants from insurer insolvencies. The original legislation thus authorized the predecessor of the WCB, in its discretion, to require insurers and employers to deposit into an

- 6 -

"Aggregate Trust Fund" ("ATF") the present value of death, total permanent disability, and permanent partial disability benefits that would otherwise be paid out for a period of two or more years.

22.    Subsequently, in the 1920s and 1930s, many workers' compensation insurers went bankrupt. In response, the legislature amended the WCL to make lump sum deposits mandatory for death, permanent total disability, and permanent partial disability benefits involving a loss of limbs or eyes, if those benefits were payable by a stock or mutual insurer.

23.    The ATF is a fund administered by the New York State Insurance Fund ("NYSIF"). The NYSIF is a state agency that sells workers' compensation insurance. WCL § 76. It is thus a competitor of Liberty Mutual and other private carriers.

24.    Prior to the 2007 legislation described below, § 32 of the WCL authorized insurers to enter into settlement agreements with claimants, called "waiver agreements," with respect to claims requiring a deposit to the ATF. The ATF had no role in this settlement process. Waiver agreements were subject to the approval of the WCB, which reviewed them to ensure they were not "unfair, unconscionable, or improper as a matter of law." WCL § 32(b) (2006) (subsequently amended).

25.    Insurers had the opportunity to be heard by the WCB on the issue whether the agreement should be approved. 12 NYCRR § 3036(d)(3). If an agreement was disapproved, the insurer had the right to judicial review. WCL § 32(c) (2006) (subsequently amended). If the amount paid to the claimant under the settlement agreement was less than the amount of the deposit with the ATF, the insurer was entitled to a refund of the excess. WCL § 27(4) (2006) (subsequently amended).

**2007 Amendments**

26.    The Workers' Compensation Reform Act of 2007 amended the ATF-related provisions of the WCL (the "2007 Amendments") in several major respects.  One was to significantly expand the category of claims for which lump sum deposits are required.  WCL § 27.  Before the 2007 Amendments, the only category of permanent partial disability claims subject to the deposit requirement were "schedule" claims involving the loss of a limb or vision. The 2007 legislation extended the deposit requirement to include all "classified" permanent partial disabilities.

27.    "Classified" permanent partial disabilities often are more serious than "schedule" disabilities and require the payment of much higher levels of compensation.  Many of the "schedule" disabilities involve relatively minor injuries, such as the loss of a finger, whereas "classified" disabilities are those that result in serious impairment.

28.    This change was given retroactive application.  The enactment date of the legislation was March 13, 2007, and the new deposit requirement applied to all awards of permanent partial disability made after July 1, 2007.  Awards made after that date may apply to injuries occurring before July 1, 2007, or to claims made before that date.  As a result, the amendment was retroactive because it applied to claims arising under insurance contracts issued prior to March 13, 2007.

29.    The 2007 changes will apply retroactively for a very long period of time.  The deposit requirement is triggered when an award of compensation is made by the WCB. Frequently, awards are made many years after the date of the injury and, therefore, many years after the applicable insurance policy was issued.

30.    This is for several reasons.  The most important is that an award is made only after a permanent partial disability is "classified," which may not occur for many years.  Classification does not take place before two years pass after the injury date or one year after the last surgery. A case can have multiple surgeries with each one re-setting the possible classification date to one year after that last surgery.  In addition, a claimant's injury might not initially be a classified PPD but may subsequently be exacerbated or deteriorate into a PPD.

31.    Another reason is that claims can be disputed and there may be a long period before a final adjudication determines that there should be an award.  A further reason is that the Workers' Compensation Law also covers occupational diseases and other types of latent injury. These may not be discovered by the worker until many years after the relevant insurance policy has been issued.

32.    For several reasons, deposits for the new category of PPD claims covered by the 2007 Amendments will be unusually large.  First, as explained above, "classified" permanent partial disabilities are especially serious and thus require payment of higher compensation.

33.    Second, prior to July 1, 2007, PPD benefits had to be paid over the entire remaining life of the claimant.  Under the new deposit requirement, instead of paying these benefits out on a biweekly basis over many years, the insurer will be required to make an up-front deposit of their present value.  The 2007 legislation capped the time period for permanent partial disability benefits for periods ranging from 225 to 525 weeks (approximately 4 to 10 years).  WCL § 15(3)(w).  But this new statutory cap was not made retroactive and thus does not cover claims submitted before July 1, 2007.

34.    Additionally, the 2007 Amendments made significant changes to the provision governing settlement agreements.  Once it makes a deposit, the insurer no longer has authority to

- 9 -

enter into settlement agreements with claimants; instead, the ATF is given exclusive settlement authority even though the claim was made against the insurer. WCL § 32. This change also was applied retroactively and governs all types of claims, not just the new category of PPD claims covered by the amendment to § 27. In the event that the ATF settles a claim for less than the full amount, the insurer's right to refund of the excess is eliminated and the ATF gets to keep the excess. WCL § 27(8).

35. The 2007 Amendments also eliminated the insurer's procedural rights. The amended law states that "no consultation or approval of any . . . insurance carrier . . . shall be required before the [ATF] may enter into any waiver agreement, or before the [WCB] may approve such waiver agreement." WCL § 32(e). Thus, the insurer is not given an opportunity to be heard on the proposed settlement. If the WCB approves the settlement, the insurer is denied judicial review of that decision. WCL § 32(c).

**Impact on Liberty Mutual's Contractual Rights**

36. The 2007 Amendments will have a significant adverse impact on Liberty Mutual's rights under the insurance contract. Indeed, the Amendments will affect the most important of those rights – Liberty Mutual's contractual entitlement to a premium reasonably calculated to cover anticipated losses and expenses.

37. The 2007 legislation will substantially increase the volume of losses above what Liberty Mutual anticipated at the time it entered into its insurance contracts. This is due to the elimination of Liberty Mutual's authority to settle claims once a deposit has been made to the ATF. Settlement is one of Liberty Mutual's most important cost control rights under the contract.

38.    Based on the data I have reviewed in preparing this declaration, 20 percent of "classified" PPD claims are resolved by settlement. The average amount of the settlement is 75 percent of the reserves set aside to pay the full claim, discounted to present value. Claimants are willing to settle for these amounts because of the desirability of getting an upfront, lump sum payment. Settlement also allows an employee to return to the labor market without the loss of benefits. If they are getting a weekly benefit they have a duty to report any earned income. This can reduce the amount of the weekly benefit. Once a claim is settled they are free to do as they please concerning return to work. Thus, retroactive elimination of Liberty Mutual's settlement rights will increase the amounts it must pay out on claims substantially above the losses it expected at the time it entered into the insurance contract.

39.    The 2007 Amendments also will increase Liberty Mutual's costs of administering claims. Once a deposit has been made to the ATF, the ATF assumes responsibility for handling the claim and charges a fee for that service. The fee the ATF currently charges is three percent of reserves. It is therefore likely that the ATF will charge the same rate for PPD claims. Liberty Mutual can handle claims for substantially less. As a result, retroactive application of the 2007 Amendments will substantially increase Liberty Mutual's claims handling costs above what the company expected when it issued its policies.

40.    Liberty Mutual will have no means by which to recoup the unanticipated losses and expenses caused by retroactive application of the 2007 Amendments. As described above, insurance ratemaking is prospective in nature and rates are calculated solely to cover anticipated losses and expenses during the time period when the policy is in effect. Therefore, Liberty Mutual cannot recover unanticipated losses and expenses caused by the 2007 legislation by increasing its rates for future policies. The company must absorb those losses.

**Rationales for the Legislation**

41.    I am told that one of the possible purposes of the 2007 legislation was to protect claimants against the danger that an insurer would become insolvent. But there has been no pattern in recent years, or threat, of bankruptcies of New York workers' compensation insurers that might justify more protection. Further, as described above, there is a comprehensive, three-tiered regulatory system (solvency regulation, rate regulation, and the Security Fund) that already fully protects claimants.

42.    Nor is there any threat to the solvency of the Security Fund that would justify applying the new deposit requirement retroactively. Even in the event of a major insolvency, the Security Fund could impose post-bankruptcy assessments to make up any shortfall in the Fund.

43.    Even if there was a need for a deposit requirement imposed on insurers in poor financial condition, Liberty Mutual does not fall into that category. It has high financial and claims ratings from rating agencies.

44.    The real risk of insolvency is that self-insured employers will go bankrupt. In fact, that has already begun happening. Several "group self-insured trusts" – groups of self-insured employers – have gone bankrupt and have been unable to pay claims. The WCB attempted to assess the solvent trusts, which sued to block the assessments. The Supreme Court in Albany held that the WCB must first determine that the trusts are insolvent. See Exhibit 2 attached hereto. If there is a significant risk that self-insured employers will go insolvent, but no such risk in the case of insurers, it makes no sense to impose the new deposit requirement on the latter but not the former.

45.    I am also told that a possible purpose of the 2007 legislation was to encourage insurers to enter into settlement agreements. I am not aware of any insurer-related settlement

problem that would justify retroactive application of the new deposit requirement. Liberty Mutual does not dispute the great majority of claims made under its policies. Further, as to those claims that are controverted, it enters into settlement agreements in a majority of cases. Indeed, it is in the company's best interests to settle claims because settlements usually result in amounts far less than the full claim.

46.    But in any case, the new deposit requirement will actually create strong disincentives to settle. This is so for several reasons.

47.    First, a deposit requirement will give insurers an incentive to dispute claims rather than settle them. The deposit requirement is triggered by an award of compensation. Thus, if the insurer disputes a claim, then no deposit need be made while the claim is being adjudicated. Thus, an insurer would have an incentive to dispute a greater number of claims in order to avoid the expensive deposit requirement.

48.    Another disincentive for the insurer to settle has to do with the bifurcation of indemnity and medical benefits. Before the 2007 Amendments, the insurer could enter into a package settlement with the claimant covering both lost wages and the cost of medical treatment. Now, once a deposit is made, only the ATF has the authority to settle the indemnity part of the claim. Because the insurer no longer has the ability to settle the entire claim, the injured worker may be less inclined to enter into a settlement. Historically insurers settle both indemnity and medical but this approach does not alert the insurer to the settlement negotiations so they can attempt to finalize all issues

49.    Second, there also will be a disincentive for the injured worker to settle. The ATF has an incentive to settle at a higher amount than the insurer or to pay the entire award. The deposit made with the ATF comes out of the insurer's pocket and thus the ATF has no financial

risk that might motivate it to enter into settlements reducing its liability. Thus, claimants have an incentive to avoid engaging the insurer in settlement negotiations but, instead, to await the insurer's deposit to the ATF and then negotiate with it rather than the carrier.

50.   The expanded deposit requirement also will frustrate another of the 2007 amendments designed to increase settlements. That amendment requires the insurer to make a settlement offer to the claimant within two years after the injury is classified or six months after an award is made. WCL § 32. The deposit requirement virtually nullifies this requirement. Once the deposit is made, the insurer loses its authority to settle and thus cannot make the required offer.

51.   The legislature had other means to encourage settlement that would be much more effective than an expanded deposit requirement but without its adverse side effects. For example, the legislature could have expedited the WCB's settlement review process. Or it could have strengthened the "conciliation" or mediation process before the WCB.


I declare under perjury that the foregoing is true and correct.

Executed on

8-1-2008

_____
James Hall

# EXHIBIT 1



NEW YORK CONSTRUCTION CLASSIFICATION PREMIUM ADJUSTMENT PROGRAM
WORKERS COMPENSATION PREMIUM CREDIT APPLICATION FOR 2007

The New York Construction Classification Premium Adjustment Program is applicable to qualifying employers engaged in construction operations and is applicable to new and renewal policies with effective dates on or after Apr 1, 1993 . In order to qualify for the program the following conditions must be met:

    1. Your policy must contain one or more eligible construction classifications.

    2. Your policy must be experience rated.

    3. You must have an hourly wage of $15.50 or higher.

A special premium calculation, which may result in premium credit for you, will be based on average hourly pay rates for each classification of construction operations. If you qualify for this program and are also experience rated, the expected losses used in the calculation of your experience modification will be decreased by your policy credit factor. This adjustment will partially offset the premium credit to the extent that your own payroll and loss experience has already been recognized in the experience rating calculation.

In order that your premium credit may be correctly established, please return the completed Premium Credit Application to the

    NEW YORK COMPENSATION INSURANCE RATING BOARD
    200 EAST 42nd STREET
    NEW YORK, NY 10017
    ATTENTION: FIELD SERVICES DEPARTMENT

The Board will advise us of any applicable premium credit.

If they do not receive this application, your premium calculation will not reflect any possible premium credit.

For each classification (both construction and non-construction) covering your company's operations in the state of New York, report the total New York payroll (excluding overtime premium pay) and the corresponding total number of hours worked, for the third calendar quarter (JULY, AUGUST, SEPTEMBER) as reported to taxing authorities for the year preceding your policy effective dates.

Note 1:    If you did not engage in construction operations during the third quarter, the requested information to be provided should, then, be for the last complete calendar quarter prior to the effective date of your workers compensation policy for which there was payroll for eligible construction classification codes.

Note 2:    If you are a new business (no prior operations), submit the requested information, for the first complete calendar quarter following the effective date of your workers compensation policy when available.

Note 3:    In the absence of specific records for salaried employees, you should assume that each individual worked forty (40) hours per week.

Please retain your payroll records which formed the basis for this declaration as we will be required to verify, upon audit of your policy, the reported information in order for any premium credit to be applied.

Thank you for your cooperation.

    Sincerely,

    LIBERTY MUTUAL INSURANCE COMPANY

**Liberty Mutual Insurance Group/Boston**
Equal Opportunity Employer
**WNYCC R4**

Ed. 01/01/2007
Page 1 of 2

# NEW YORK
## WORKERS COMPENSATION - PREMIUM CREDIT APPLICATION

**INSURED:** Test NY

**COVERAGE ID NO.:**

**POLICY NO.** WC1-111-001348-211

**EFFECTIVE DATE** 10/01/2007

**Notice:** This Application will not be processed unless it is signed and completed in its entirety. Contact your agent, broker or insurance company if assistance is needed.

COLUMBUS, OH-CE
SUITE 300
630 MORRISON ROAD
GAHANNA, OH 43230

1. Classification(s), Code(s), Total Wages Paid for residential work only or Limited Payroll for commercial work applicable to the Payroll Limitation Law, Total Hours Worked and calendar quarter reported must be indicated.
   NOTE: Limited Payroll for commercial work means the weekly maximum (currently $750 per week) for work on structures other than one or two family dwellings in accordance with the Payroll Limitation Law. If you perform commercial work under any eligible codes(s) enter each employee for the weekly maximum only and their total hours worked (ex. 13 weeks @ $750 per week = $9,750 total wages).
2. Construction and non-construction wages must be included. DO NOT include the payrolls for subcontractors and independent contractors.
3. Each executive officer's wage and title is to be separately shown under the appropriate classification code. Hours worked for each executive officer are to be stated as 520 per quarter (if the executive officer(s) are excluded from coverage, then no entry is required).

| CLASSIFICATION | CODE | NEW YORK WAGES PAID* | TOTAL HOURS WORKED |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

* EXCLUDING OVERTIME PREMIUM PAY. Overtime premium pay is the wage paid above the straight time hourly pay. Ex: If an employee earns $20/hr, but earns overtime pay at an hourly rate of $30 or more, exclude any wage paid over the $20/hr. rate.

The foregoing is based on actual wages and hours worked, as reflected in our payroll records, for the complete calendar quarter ending _____.

NAME _____  TITLE _____  DATE _____

SIGNATURE _____  TELEPHONE NUMBER _____

EMAIL ADDRESS _____

# *STATE MANDATED NOTICES*

# NOTICE TO EMPLOYERS

The Construction Employment Payroll Limitation Law, enacted under Senate Bill S7744 and Assembly Bill A11294, provides a more equitable distribution of premium between high wage paying and low wage paying employers in the construction industry. The Law applies to employers with an anniversary rating date on or after October 1, 1999. One or more of the classification codes applicable to your policy may be subject to the Payroll Limitation Law. The Law does not, however, apply to employment engaged in the construction of one or two family residential housing.

Your overall premium may increase or decrease depending upon geographic territories and/or payroll limitations. The actual weekly payroll of each employee performing employments subject to an eligible classification code is subject to the following limitations:

> a maximum of $900 per week plus ½ of the difference between the employee's total payroll and the limited payroll for policies with effective dates beginning October 1, 1999 and ending September 30, 2000;

> a maximum of $900 per week for policies with effective dates beginning October 1, 2000 and ending September 30, 2001;

> a maximum of $800 per week for policies with effective dates beginning October 1, 2001 and ending September 30, 2002; and

> a maximum of the greater of $750 or the weekly wage upon which the maximum weekly benefit is based for policies with effective dates on or after October 1, 2002.

The construction employment geographic territories are:

> Territory 1- Counties of The Bronx, Kings, New York, Queens and Richmond
> Territory 2- Counties of Dutchess, Nassau, Orange, Putnam, Rockland, Suffolk and Westchester
> Territory 3- All other counties within the State

**Please note that since your operations may be subject to the law, an employer with an eligible classification code is required to maintain true and accurate weekly records for each employee that shows:**

1. Each employee's total weekly wages and hours worked;

2. The type of work performed;

3. The geographic territory in which the work was performed; and,

4. Whether or not the work was performed on commercial structures or on one/two family residential housing.

If you have any questions regarding this law, please contact your agent, broker or insurance carrier underwriter.

GPO 4733
Page 1 of 1
Ed. 10/1999
Copyright 1999 New York Compensation Insurance Rating Board

# NEW YORK WORKERS COMPENSATION SECURITY FUND RECOUPMENT

Companies writing workers compensation insurance business in New York are required to participate in the New York Workers' Compensation Security Fund. If a company becomes insolvent, the security fund settles unpaid claims and assesses each insurance company for its fair share.

New York law requires all companies to surcharge policies to recover these assessments. If your policy is surcharged "NY surcharge", an amount will be displayed on your premium notice.

GPO 4847
Page 1 of 1
Ed. 10/01/2004


Liberty Mutual.

## LIBERTY MUTUAL WORKERS COMPENSATION GROUP BENEFITS, AND HELMSMAN MANAGEMENT SERVICES, LLC
### PRIVACY PRACTICES DISCLOSURE NOTICE

This Privacy Practices Disclosure Notice outlines the privacy practices for Liberty Mutual Insurance Company and its subsidiaries and affiliates listed below (collectively referred to as "Liberty Mutual"):

- Liberty Mutual Fire Insurance Company
- LM Insurance Corporation
- Liberty Insurance Company of America
- Liberty Life Assurance Company of Boston

- Liberty Insurance Corporation
- The First Liberty Insurance Corporation
- Liberty Northwest Insurance Corporation
- Helmsman Management Services, LLC

This Notice tells you:

- The categories of nonpublic personal information (NPPI) we collect from you or from a third party about you or about participants, beneficiaries or claimants under your workers compensation and/or group benefit coverage, or your employee benefit programs or plans;

- How we use NPPI;

- The categories of affiliates and non-affiliate third parties with whom we share NPPI;

- The security policies and procedures in place to protect the confidentiality and security of NPPI provided to us.

If you have questions regarding this Privacy Practices Disclosure Notice, contact us by sending an email to pstprivacy@libertymutual.com or write to us at:

**Presidential Service Team**
**Liberty Mutual Insurance Company**
**175 Berkeley Street**
**Boston, MA 02117**

If applicable, please include your policy number or contract number with any correspondence.

## 1. INFORMATION WE MAY COLLECT

We want you to conduct business with us knowing that we protect NPPI. We collect NPPI from you or from third parties about you or about participants, beneficiaries or claimants under your insurance coverage. We collect NPPI from:

- Applications or other forms which may include policyholder, participant, beneficiary or claimant name, address, phone number, social security number, household information, vehicle and driver information, date of birth, medical information related to underwriting and claims, insurance coverage, and employee benefit programs or plan information;

- Your business dealings with us, our affiliates, or others, such as prior claims or accidents, medical information related to claims, information about your accident or injury (if applicable), and the names of witnesses and other contact information; and

- Consumer reporting agencies, motor vehicle departments, and inspection services.

GPO 4756 R3
Page 1 of 2
Ed. 11/01/2005

2.    HOW THE INFORMATION IS USED

We use NPPI:

- To provide policy and premium quotes;

- To underwrite applications, administer claims, and answer questions about our insurance products and services;

- For account administration and processing premium billings payments;

- To process and defend insurance claims, and administer insurance benefits (including utilization review activities);

- To report, investigate, or prevent fraud or material misrepresentation; and

- As otherwise required or permitted by federal or state law.

3.    TO WHOM INFORMATION IS DISCLOSED

We do not disclose NPPI about you or about participants, beneficiaries or claimants under your insurance policy, employee benefit programs or plans to anyone, unless allowed by law. We are allowed by law to provide NPPI to:

- A third party that performs services for us, such as claims investigations or medical examinations;

- Our affiliated companies and reinsurers;

- Insurance regulators, reporting agencies or, if applicable, involuntary market administrators;

- State Motor Vehicle Departments to obtain a report of any accidents or convictions;

- Law enforcement agencies or other governmental authorities to report suspected illegal activities;

- Persons or organizations conducting insurance actuarial or research studies, subject to appropriate confidentiality agreements;

- Companies that provide marketing services on our behalf, or as part of a joint marketing agreement; and,

- As otherwise permitted or required by law.

4.    HOW WE PROTECT INFORMATION

We maintain physical, electronic, and procedural safeguards to guard NPPI. These safeguards comply with applicable laws. We retain NPPI for as long as required by law or regulation. The only employees or agents who have access to your NPPI are those who must have it to provide products or services to you. We do not sell your NPPI to mass marketing or telemarketing companies.

GPO 4756 R3
Page 2 of 2
Ed. 11/01/2005



# COMMERCIAL

# POLICY

## WORKERS' COMPENSATION AND

## EMPLOYERS' LIABILITY POLICY FOR

WC1-111-001348-211

Test NY
and as per endorsement 1

1 First Street
Portsmouth, NH 12345

**WORKERS COMPENSATION AND
EMPLOYERS LIABILITY POLICY**

**THIS POLICY IS NONASSESSABLE**



Liberty Mutual Insurance Group/Boston

FOR PROMPT INSURANCE SERVICE -
CALL YOUR SERVICE OFFICE

**THIS POLICY IS CLASSIFIED IN DIVIDEND
CLASS XIII WORKERS COMPENSATION
AND EMPLOYERS LIABILITY**

----------

While this policy is in effect, the named insured
first named in the Information Page is a
member of Liberty Mutual Holding Company
Inc. and is entitled to vote either in person or
by proxy at any and all meetings of the
members of said company.

----------

The Annual Meeting of Liberty Mutual Holding
Company Inc. is in Boston, Massachusetts, on
the second Wednesday in April each year at
ten o'clock in the morning.

**Liberty Mutual Fire Insurance Company** (A stock insurance company, herein called the company)

In return for the payment of the premium and subject to all terms of this policy, we agree with you as follows.

## GENERAL SECTION

### A. The Policy

This policy includes at its effective date the Information Page and all endorsements and schedules listed there. It is a contract of insurance between you (the employer named in item 1 of the Information Page) and us (the insurer named on the Information Page). The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy.

### B. Who is Insured

You are insured if you are an employer named in item 1 of the Information Page. If that employer is a partnership, and if you are one of its partners, you are insured, but only in your capacity as an employer of the partnership's employees.

### C. Workers Compensation Law

Workers Compensation Law means the workers or workmen compensation law and occupational disease law of each state or territory named in Item 3.A. of the Information Page. It includes any amendments to that law which are in effect during the policy period. It does not include any federal workers or workmen's compensation law, any federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

### D. State

State means any state of the United States of America, and the District of Columbia.

GPO 4032 R2
Page 1 of 10
16586
Ed. 03/19/2002 **WC 2** Printed in U.S.A.

Copyright 1991 National Council on Compensation Insurance

WC 00 00 00A

### E. Locations

This policy covers all of your workplaces listed in items 1 or 4 of the Information Page; and it covers all other workplaces in item 3.A. states unless you have other insurance or are self-insured for such workplaces.

## PART ONE - WORKERS COMPENSATION INSURANCE

### A. How This Insurance Applies

This workers compensation insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. Bodily injury by accident must occur during the policy period.

2. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

### B. We Will Pay

We will pay promptly when due the benefits required of you by the workers compensation law.

### C. We Will Defend

We have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance.  We have the right to investigate and settle these claims, proceeding or suits.

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance.

### D. We Will Also Pay

We will also pay these costs, in addition to other amounts  payable under this insurance,  as part of any claim, proceeding or suit we defend:

1. reasonable expenses incurred at our request, but not loss of earnings;

2. premiums for bonds to release attachments and for appeal bonds in bond amounts up to the amount payable under this insurance;

3. litigation costs taxed against you;

4. interest on a judgement as required by law until we offer the amount due under this  insurance; and

5. expenses we incur.

Copyright 1991 National Council on Compensation Insurance    WC 00 00 00A

### E. Other Insurance

We will not pay more than our share of benefits and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that may apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance will be equal until the loss is paid.

### F. Payments You Must Make

You are responsible for any payments in excess of the benefits regularly provided by the workers compensation law including those required because:

1. of your serious and willful misconduct;

2. you knowingly employ an employee in violation of law;

3. you fail to comply with a health or safety law or regulation; or

4. you discharge, coerce or otherwise discriminate against any employee in violation of the workers compensation law.

If we make any payments in excess of the benefits regularly provided by the workers compensation law on your behalf, you will reimburse us promptly.

### G. Recovery From Others

We have your rights, and the rights of persons entitled to the benefits of this insurance, to recover our payments from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them.

### H. Statutory Provisions

These statements apply where they are required by law.

1. As between an injured worker and us, we have notice of the injury when you have notice.

2. Your default or the bankruptcy or insolvency of you or your estate will not relieve us of our duties under this insurance after an injury occurs.

3. We are directly and  primarily liable to any person entitled to the benefits payable by this insurance. Those persons may enforce our duties; so may an agency authorized by law. Enforcement may be against us or against you and us.

4. Jurisdiction over you is jurisdiction over us for purposes of the workers compensation law.  We are bound by decisions  against you under that law,  subject to the  provisions of this policy that are not in conflict with that law.

5. This insurance conforms to the parts of the workers compensation law that apply to:

   a. benefits payable by this insurance;

   b. special taxes, payments into security or other special funds, and assessments payable by us under that law.

6. Terms of this insurance that conflict with the workers compensation law are changed by this statement to conform to that law.

Nothing in these paragraphs relieves you of your duties under this policy.

## PART TWO - EMPLOYERS LIABILITY INSURANCE

### A. How This Insurance Applies

This employers liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. The bodily injury must arise out of and in the course of the injured employee's employment by you.

2. The employment must be necessary or incidental to your work in a state or territory listed in item 3.A. of the Information Page.

3. Bodily injury by accident must occur during the policy period.

4. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

5. If you are sued, the original suit and any related legal actions for damages for bodily injury by accident or by disease must be brought in the United States of America, its territories or possessions, or Canada.

### B. We Will Pay

We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.

The damages we will pay, where recovery is permitted by law, include damages:

1. for which you are liable to a third party by reason of a claim or suit against you by that third party to recover the damages claimed against such third party as a result of injury to your employee;

2. for care and loss of services; and

3. for consequential bodily injury to a spouse, child, parent, brother or sister of the injured employee;

provided that these damages are the direct consequence of bodily injury that arises out of and in the course of the injured employee's employment by you; and

4. because of bodily injury to your employee that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

## C. Exclusions

This insurance does not cover:

1. liability assumed under a contract.  This  exclusion does not apply to a warranty that your work will be done in a workmanlike manner;

2. punitive or exemplary damages because of bodily injury to an employee employed in violation of law;

3. bodily injury to an employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your executive officers;

4. any obligation imposed by workers compensation, occupational disease, unemployment compensation, or disability benefits law, or any similar law;

5. bodily injury intentionally caused or aggravated by you;

6. bodily injury occurring outside the United States of America, its territories or possessions, and Canada.  This exclusion does not apply to bodily  injury to a citizen or resident of the United States of America or Canada who is temporarily outside these countries;

7. damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, acts or omissions.

8. bodily injury to any person in work subject to the Longshore and Harbor Workers' Compensation Act (33 USC Sections 901-950), the  Nonappropriated Fund  Instrumentalities Act (5 USC Sections 8171-8173), the Outer Continental Shelf Lands Act (43 USC Sections 1331-1356), the Defense Base Act (42 USC Sections 1651-1654), the  Federal Coal Mine  Health and Safety Act of 1969 (30 USC Sections 901-942), any other  federal workers or workmen's compensation law or other federal occupational disease law, or any amendments to these laws.

9. bodily injury to any person in work subject to the Federal Employers' Liability Act (45 USC Sections 51-60), any other federal laws obligating an employer to pay damages to an employee due to bodily injury arising out of or in the course of employment, or any amendments to those laws.

10. bodily injury to a master or member of the crew of any vessel.

11. fines or penalties imposed for violation of federal or state law.

12. damages payable under the Migrant and Seasonal Agricultural Workers Protection Act (29 USC Sections 1801-1872) and under any other federal law awarding damages for violation of those laws or regulations issued thereunder, and any amendments to those laws.

## D.  We Will Defend

We have the right and duty to defend, at our expense, any claim, proceeding or suit against you for damages payable by this insurance.  We have the right to investigate and settle these claims, proceedings and suits.

We have no duty to defend a claim,  proceeding or suit that is not covered by this insurance.   We have no duty to defend or continue defending after we have paid our applicable limit of liability under this insurance.

## E.  We Will Also Pay

We will also pay these costs, in addition to other  amounts  payable under this insurance, as part of any claim, proceeding, or suit we defend:

1.  reasonable expenses incurred at our request, but not loss of earnings;

2.  premiums for bonds to release attachments and for  appeal bonds in  bond  amounts up to the limit of our liability under this insurance;

3.  litigation costs taxed against you;

4.  interest on a  judgment as  required by law until we offer the  amount due under this insurance; and

5.  expenses we incur.

## F.  Other Insurance

We will not pay more than our share of damages and costs covered by this insurance and other insurance or self-insurance.  Subject to any limits of  liability that apply, all shares will be equal until the loss is paid.   If any insurance or self-insurance is  exhausted, the shares of all remaining insurance and self-insurance will be equal until the loss is paid.

## G.  Limits of  Liability

Our liability to pay for damages is limited.  Our limits of liability are shown in item 3.B. of the Information Page. They apply as explained below.

1.  Bodily Injury by Accident.  The limit shown for  "bodily injury by accident-each accident"  is the most we will pay for all damages  covered by this insurance because of bodily injury to one or more employees in any one accident.  A disease is not bodily injury by accident unless it results directly from bodily injury by accident.

2. Bodily Injury by Disease. The limit shown for "bodily injury by disease-policy limit" is the most we will pay for all damages covered by this insurance and arising out of bodily injury by disease, regardless of the number of employees who sustain bodily injury by disease. The limit shown for "bodily injury by disease-each employee" is the most we will pay for all damages because of bodily injury by disease to any one employee.

Bodily injury by disease does not include disease that results directly from a bodily injury by accident.

3. We will not pay any claims for damages after we have paid the applicable limit of our liability under this insurance.

### H. Recovery From Others

We have your rights to recover our payment from anyone liable for an injury covered by this insurance. You will do everything necessary to protect those rights for us and to help us enforce them.

### I. Actions Against Us

There will be no right of action against us under this insurance unless:

1. You have complied with all the terms of this policy; and

2. The amount you owe has been determined with our consent or by actual trial and final judgement.

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability. The bankruptcy or insolvency of you or your estate will not relieve us of our obligations under this Part.

### PART THREE - OTHER STATES INSURANCE

### A. How This Insurance Applies

1. This other states insurance applies only if one or more states are shown in item 3.C. of the Information Page.

2. If you begin work in one of those states after the effective date of this policy and are not insured or are not self-insured for such work, all provisions of the policy will apply as though that state were listed in Item 3.A. of the Information Page.

3. We will reimburse you for the benefits required by the workers compensation law of that state if we are not permitted to pay the benefits directly to persons entitled to them.

4. If you have work on the effective date of this policy in any state not listed in Item 3.A. of the Information Page, coverage will not be afforded for that state unless we are notified within thirty days.

### B. Notice

Tell us at once if you begin work in any state listed in item 3.C. of the Information Page.

Page 7 of 10

## PART FOUR - YOUR DUTIES IF INJURY OCCURS

Tell us at once if injury occurs that may by covered by this policy. Your other duties are listed here.

1. Provide for immediate medical and other services required by the workers compensation law.

2. Give us or our agent the names and addresses of the injured persons and of witnesses, and other information we may need.

3. Promptly give us all notices, demands and legal papers related to the injury, claim, proceeding or suit.

4. Cooperate with us and assist us, as we may request, in the investigation, settlement or defense of any claim, proceeding or suit.

5. Do nothing after an injury occurs that would interfere with our right to recover from others.

6. Do not voluntarily make payments, assume obligations or incur expenses, except at your own cost.

## PART FIVE - PREMIUM

### A. Our Manuals

All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

### B. Classifications

Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

### C. Remuneration

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:

1. all your officers and employees engaged in work covered by this policy; and

2. all other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

D. **Premium Payments**

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid.

E. **Final Premium**

The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is cancelled, final premium will be determined in the following way unless our manuals provide otherwise:

1. If we cancel, final premium will be calculated pro-rata based on the time this policy was in force. Final premium will not be less than the pro-rata share of the minimum premium.

2. If you cancel, final premium will be more than pro-rata; it will be based on the time this policy was in force, and increased by our short rate cancelation table and procedure. Final premium will not be less than the minimum premium.

F. **Records**

You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them.

G. **Audit**

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audit during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.

## PART SIX- CONDITIONS

A. **Inspection**

We have the right, but are not obliged to inspect your workplaces at any time. Our inspections are not safety inspections. They relate only to the insurability of the workplaces and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public. We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards. Insurance rate service organizations have the same rights we have under this provision.

B. **Long Term Policy**

If the policy is longer than one year and sixteen days, all provisions of this policy will apply as though a new policy were issued on each annual anniversary that this policy is in force.

C. **Transfer of Your Rights and Duties**

Your rights or duties under this policy may not be transferred without our written consent.

If you die and we receive notice within thirty days after your death, we will cover your legal representative as insured.

D. **Cancelation**

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancelation is to take effect.

2. We may cancel this policy. We must mail or deliver to you not less than ten days advance written notice stating when the cancelation is to take effect. Mailing that notice to you at your mailing address shown in item 1 of the Information Page will be sufficient to prove notice.

3. The policy period will end on the day and hour stated in the cancelation notice.

4. Any of these provisions that conflicts with a law that controls the cancelation of the insurance in this policy is changed by this statement to comply with that law.

E. **Sole Representative**

The insured first named in Item 1 of the Information Page will act on behalf of all insureds to change this policy, receive return premium, and give or receive notice of cancelation.

In witness whereof, the company has caused this policy to be signed by its President and its Secretary at Boston, Massachusetts, and countersigned on the Information Page by a duly authorized representative of the company.

Dexter R. Legg      Edmund F. Kelly
SECRETARY           PRESIDENT

## LIBERTY MUTUAL FIRE INSURANCE COMPANY

## NOTICE OF MEMBERSHIP IN LIBERTY MUTUAL HOLDING COMPANY INC. AND NOTICE OF ANNUAL MEETING

Your policy includes a statement regarding membership rights in Liberty Mutual Holding Company Inc. Liberty Mutual Fire Insurance Company is a Massachusetts stock insurance company subsidiary of Liberty Mutual Holding Company Inc., a Massachusetts mutual holding company. Insurance is provided by Liberty Mutual Fire Insurance Company. The named insured first named in the declarations is a member of Liberty Mutual Holding Company Inc.

As a member of Liberty Mutual Holding Company Inc., the named insured first named is entitled, among other things, to vote either in person or by proxy at the annual meeting or special meetings of said company. The Annual Meeting of Liberty Mutual Holding Company Inc. is at its offices located at 175 Berkeley Street, Boston, Massachusetts, on the second Wednesday in April each year at ten o'clock in the morning.

Members of Liberty Mutual Holding Company Inc. may request a copy of the company's annual financial statements, which are posted on Liberty Mutual's website at www.libertymutual.com, by writing to Liberty Mutual Holding Company Inc., 175 Berkeley Street, Boston, Massachusetts, 02117, Attention: Corporate Secretary.

**GPO 4772**
Ed. 3/19/2002

D

ABC

## ISSUING OFFICE 800
## INFORMATION PAGE

**Workers Compensation and Employers Liability Policy**

| ACCOUNT NO. 1-001348 | SUB ACCT NO. 0000 | Liberty Mutual Insurance Group/Boston | | | | | |
|---|---|---|---|---|---|---|---|

Liberty Mutual Fire Insurance Company    16586

| POLICY NO. | TD/CD | SALES OFFICE | | CODE | SALES REPRESENTATIVE | CODE | N/R | IST YEAR |
|---|---|---|---|---|---|---|---|---|
| WC1-111-001348-211 | 72/2 | AKRON, OH | | 850 | ALVES | 7213 | 1 | 2003 |

Item 1. Name of Test NY
Insured  and as per endorsement 1

Address  1 First Street
Portsmouth, NH 12345

FEIN 224444444

RISK ID 123

Status  Association

Other workplaces not shown above:  See Item 4

| | Mo. | Day | Year | | Mo. | Day | Year | |
|---|---|---|---|---|---|---|---|---|
| Item 2. Policy Period: From | 10 | 01 | 2007 | to | 10 | 01 | 2008 | |
| | | 12:01 am | | | standard time at the address of the insured as stated herein. | | | |

Item 3. Coverage

A. Workers Compensation Insurance: Part One    of the policy applies to the Workers Compensation  Law of the states listed here:

NY

B. Employers Liability Insurance: Part Two of the policy applies to work in each state listed    in item 3.A. The limits of our liability under Part Two are:

| Bodily Injury by Accident | $100,000 | each accident |
|---|---|---|
| Bodily Injury by Disease | $500,000 | policy limit |
| Bodily Injury by Disease | $100,000 | each employee |

C. Other States Insurance: Part Three of the policy applies to the states, if any, listed here:

All States except those listed in Item 3.A and the States of:
ND OH WA WV WY

D. This policy includes these endorsements and schedules:    SEE EXTENSION OF INFORMATION PAGE

Item 4. Premium — The premium for this policy will be determined by our Manuals of Rules, Classifications, Rates and Rating Plans. All information required below is subject to verification and change by audit.

| Classifications | Code No. | Premium Basis Estimated Total Annual Remuneration | Rates Per $100 of Remuneration | LINE 110 Estimated Annual Premiums |
|---|---|---|---|---|
| SEE EXTENSION OF INFORMATION PAGE | | | | |

| Minimum Premium $ 875    (NY) | Total Estimated Annual Premium | $ 21,665 |
|---|---|---|
| Interim adjustment of premium shall be made:    Annual | Deposit Premium | $ 21,665 |

This policy, including all endorsements issued therewith, is hereby countersigned by

Authorized Representative    Date 11/02/2007

| Loc. Code | Term. Oper. KAS 11/02/2007 | Audit Basis 1 | Periodic Payment | Rating Basis NR | Pol. H.G. | Home State NY | Dividend | NCW |
|---|---|---|---|---|---|---|---|---|

GPO 4033 R1

Copyright 1987 National Council on Compensation Insurance    WC 00 00 01 A

Liberty Mutual Fire Insurance Company

Item 3. Coverage D - Extension of Information Page

## Miscellaneous Form and Endorsement Schedule

### Policy Notices and Applications

| Form Number | Form Name |
|---|---|
| WNYCCR4 | New York Construction Classification Premium Adjustment Program |
| GPO 4733 | Notice to Employers |
| GPO 4847 | New York Workers Compensation Security Fund Recoupment |
| GPO 4756 R3 | Liberty Mutual Workers Compensation, Group Benefits, and Helmsman Management Services, LCC Privacy Practices Disclosure Notice |

### Policy Schedules

| Form Number | Form Name |
|---|---|
| WC 00 00 00 A | WC Company 2 Jacket (GPO 4032 R2) |
| GPO 4772 | LMFIC - Notice of Membership in Liberty Mutual Holding Company Inc. and Notice of Annual Meeting |
| WC 00 00 01 A | Information Page (1 YR) |
| GPO 4741 | Miscellaneous Form and Endorsement Schedule |
| GPO 2923 | Item 4. Premium - Extension of Information Page |
| GPO 4162 R1 | Named Insured Link Schedule |

### Policy Endorsements

| Form Number | Form Name | End Serial No. | Comments |
|---|---|---|---|
| 102 | Name of Insured Endorsement | End. 1 | |
| WC 00 01 13 | Terrorism Risk Insurance Extension Act Endorsement | End. 2 | |
| WC 00 04 06 | Premium Discount Endorsement | End. 3 | |
| WC 00 04 14 | Notification of Change in Ownership | End. 4 | |
| WC 00 04 19 | Premium Due Date Endorsement | End. 5 | |
| WC 00 04 21 A | Domestic Terrorism, Earthquakes, and Catastrophic Industrial Accidents Premium Endorsement | End. 6 | |
| WC 00 04 22 | Foreign Terrorism Premium Endorsement | End. 7 | |
| WC 31 03 08 | New York Limit of Liability | End. 8 | |

Policy No. WC1-111-001348-211

GPO 4741
Ed.01/01/2001

Page 1

WC 00 00 01 A

Liberty Mutual Fire Insurance Company

Item 3. Coverage D · Extension of Information Page

## Miscellaneous Form and Endorsement Schedule

Continued:

| Policy Endorsements | | | |
|---|---|---|---|
| **Form Number** | **Form Name** | **End Serial No.** | **Comments** |
| WC 31 03 19 D | New York Construction Classification Premium Adjustment Program Explanatory Endorsement | End. 9 | |
| WC 31 04 04 | New York Pending Payroll Limitation and Premium Differential | End. 10 | |

Policy No. WC1-111-001348-211

GPO 4741
Ed.01/01/2001

Page 2

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | Class Code | Premium Basis Payroll - Unless otherwise indicated a) Flat Charge b) Per Capita c) Passenger Seat d) Premium e) Other | Rate Payroll- Per $100 | Estimated Premium |
|---|---|---|---|---|
| **New York** | | | | |
| Carpentry - Detached One or Two Family Dwellings | 5645 | 200,000 | 11.69 | 23,380 |
| **Manual Premium** | | | | **$23,380** |
| **Standard Premium** | | | | **$23,380** |
| Premium Discount | 0063 | | .0857 | (2,003) |
| Expense Constant | 0900 | | | 200 |
| Foreign Terrorism | 9740 | 200,000 | .034 | 68 |
| Foreign Terrorism (.021) | 9740 | 0 | | 0 |
| Domestic Terrorism, Earthquakes and Catastrophic Industrial Accidents (DTEC) | 9741 | 200,000 | .01 | 20 |
| Domestic Terrorism, Earthquakes and Catastrophic Industrial Accidents (DTEC) | 9741 | | .005 | 0 |
| **Total Premium for New York** | | | | **$21,665** |
| New York Assessment | 0932 d) | 23,468 | .155 | 3,638 |
| NY WC Security Fund Surcharge | 9749 d) | 25,303 | .02 | 506 |

Policy No. WC1-111-001348-211

Page No. 1

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

# NAMED INSURED LINK SCHEDULE

| Name Link Code | Insured Name/Location | City | State | Zip |
|---|---|---|---|---|
| 001 | Test NY | | | |
| 001 | FEIN: 22-4444444 | | | |
| 001 | Legal Status: Association | | | |
| | | | | |
| 002 | CASEY & HAYES, INC. | | | |
| 002 | FEIN: 22-2333333 | | | |
| 002 | Legal Status: Association | | | |
| 002 | No Specific Location | | NY | |

Policy No. WC1-111-001348-211

GPO4162 R1
Page 1
Ed. 11/01/2004

# NAME OF INSURED ENDORSEMENT

It is agreed that the Name of the Insured is as follows:

Test NY
FEIN: 22-4444444

CASEY & HAYES, INC.
FEIN: 22-2333333

This endorsement is executed by the Liberty Mutual Fire Insurance Company     **16586**

Premium $

Effective Date                  Expiration Date

For attachment to Policy No. WC1-111-001348-211

Countersigned by _____

Authorized Representative

End. Serial No. 1

**W102NIS**
PAGE 1

# TERRORISM RISK INSURANCE EXTENSION ACT ENDORSEMENT

This endorsement addresses the requirements of the Terrorism Risk Insurance Act of 2002 as amended and extended by the Terrorism Risk Insurance Extension Act of 2005.

**Definitions**

The definitions provided in this endorsement are based on the definitions in the Act and are intended to have the same meaning. If words or phrases not defined in this endorsement are defined in the Act, the definitions in the Act will apply.

"Act" means the Terrorism Risk Insurance Act of 2002, which took effect on November 26, 2002, and any amendments resulting from the Terrorism Risk Insurance Extension Act of 2005.

"Act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States as meeting all of the following requirements:

    a.  The act is an act of terrorism.

    b.  The act is violent or dangerous to human life, property or infrastructure.

    c.  The act resulted in damage within the United States, or outside of the United States in the case of United States missions or certain air carriers or vessels.

    d.  The act has been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Insured terrorism or war loss" means any loss resulting from an act of terrorism (including an act of war, in the case of workers compensation) that is covered by primary or excess property and casualty insurance issued by an insurer if the loss occurs in the United States or at United States missions or to certain air carriers or vessels.

"Insurer deductible" means:

    a.  For the period beginning on November 26, 2002 and ending on December 31, 2002, an amount equal to 1% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding November 26, 2002.

    b.  For the period beginning on January 1, 2003 and ending on December 31, 2003, an amount equal to 7% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2003.

    c.  For the period beginning on January 1, 2004 and ending on December 31, 2004, an amount equal to 10% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2004.

    d.  For the period beginning on January 1, 2005 and ending on December 31, 2005, an amount equal to 15% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2005.

    e.  For the period beginning on January 1, 2006 and ending on December 31, 2006, an amount equal to 17.5% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2006.

    f.  For the period beginning on January 1, 2007 and ending on December 31, 2007, an amount equal to 20% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2007.

# TERRORISM RISK INSURANCE EXTENSION ACT ENDORSEMENT

### Limitation of Liability

The Act may limit our liability to you under this policy. If annual aggregate insured terrorism or war losses of all insurers exceed $100,000,000,000 during the applicable period provided in the Act, and if we have met our insurer deductible, the amount we will pay for insured terrorism or war losses under this policy will be limited by the Act, as determined by the Secretary of the Treasury.

### Policyholder Disclosure Notice

1. Insured terrorism or war losses would be partially reimbursed by the United States Government under a formula established by the Act. Under this formula, the United States Government would pay 90% for Program Year 4 and 85% for Program Year 5 of our insured terrorism or war losses exceeding our insurer deductible.

2. The premium charged for the coverage this policy provides for insured terrorism or war losses is included in the amount shown in Item 4 of the Information Page or in the Schedule in the Foreign Terrorism Premium Endorsement, (WC 00 04 22), attached to this policy.

Not Applicable in Florida, Pennsylvania and Virginia.

This endorsement is executed by the Liberty Mutual Fire Insurance Company          16586

Premium $

Effective Date                    Expiration Date

For attachment to Policy No. WC1-111-001348-211

Countersigned by_____

Authorized Representative

End. Serial No. 2

**WC 00 01 13**
Page 2 of 2
Ed. 01/01/2006
© 2002 - 2005 National Council on Compensation Insurance, Inc

## PREMIUM DISCOUNT ENDORSEMENT

The premium for this policy and the policies, if any, listed in Item 3 of the Schedule may be eligible for a discount. This endorsement shows your estimated discount in Items 1 or 2 of the Schedule. The final calculation of premium discount will be determined by our manuals and your premium basis as determined by audit. Premium subject to retrospective rating is not subject to premium discount.

Schedule

1. Policy Numbers

Estimated Eligible Premium

Total $ _____

2. Average percentage discount: _____ %     SEE SCHEDULE GPO 2923

3. If there are no entries in Items 1 and 2 of the Schedule see the Premium Discount Endorsement attached to your policy number:

This endorsement is executed by the Liberty Mutual Fire Insurance Company          16586

Premium $

Effective Date                    Expiration Date

For attachment to Policy No.WC1-111-001348-211

Countersigned by_____

                                Authorized Representative

                                End. Serial No. 3

**WC 00 04 06**
Page 1 of 1
Ed. 4/1984
Copyright 1983 National Council on Compensation Insurance.

# NOTIFICATION OF CHANGE IN OWNERSHIP ENDORSEMENT

Experience rating is mandatory for all eligible insureds. The experience rating modification factor, if any, applicable to this policy, may change if there is a change in your ownership or in that of one or more of the entities eligible to be combined with you for experience rating purposes. Change in ownership includes sales, purchases, other transfers, mergers, consolidations, dissolutions, formations of a new entity and other changes provided for in the applicable experience rating plan manual.

You must report any change in ownership to us in writing within 90 days of such change. Failure to report such changes within this period may result in revision of the experience rating modification factor used to determine your premium.

This endorsement is executed by the **Liberty Mutual Fire Insurance Company**          **16586**

Premium $

Effective Date                    Expiration Date

For attachment to Policy No. **WC1-111-001348-211**

Countersigned by_____

Authorized Representative

End. Serial No. 4

**WC000414**
Page 1 of 1
Ed. 7/1990

# PREMIUM DUE DATE ENDORSEMENT

Section D of Part Five of the policy is replaced by this provision:

## PART FIVE
## PREMIUM

D. **Premium** is amended to read:

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid. **The due date for audit and retrospective premiums is the date of the billing.**

This endorsement is executed by the Liberty Mutual Fire Insurance Company          16586

Premium $

Effective Date                    Expiration Date 10/01/2008

Policy Eff. Date ·10/01/2007

For attachment to Policy No. WC1·111·001348·211

Countersigned by_____

                                    Authorized Representative

                                    End. Serial No. 5

WC 00 04 19
Page 1
Ed. 1/2001

© 2000 National Council on Compensation Insurance, Inc.

# DOMESTIC TERRORISM, EARTHQUAKES, AND CATASTROPHIC INDUSTRIAL ACCIDENTS PREMIUM ENDORSEMENT

This endorsement is notification that your insurance carrier is charging premium to cover the losses that may occur in the event of domestic terrorism, earthquakes, and/or a catastrophic industrial accident.

The premium charge provides funding for the risk of earthquakes, catastrophic industrial accidents, and certain acts of domestic terrorism. It does not provide funding for acts of terrorism certified as such by the Terrorism Risk Insurance Act of 2002 and any amendments resulting from the Terrorism Risk Insurance Extension Act of 2005 (the Act), or acts of foreign terrorism as that term is defined in the Foreign Terrorism Premium Endorsement (WC 00 04 22), attached to this policy.

For purposes of this endorsement, the following definitions apply:

Domestic terrorism: All acts of terrorism outside the scope of the Act or the Foreign Terrorism Premium Endorsement (WC 00 04 22), with aggregate workers compensation losses in excess of $50 million.

Earthquake: The shaking and vibration at the surface of the earth resulting from underground movement along a fault plane or from volcanic activity where aggregate workers compensation losses from the single event are in excess of $50 million.

Catastrophic Industrial Accident: Any single event resulting in aggregate workers compensation losses in excess of $50 million.

## Schedule

| Payroll | Rate | Premium |
|---------|------|---------|

See Attached Premium Schedule GPO 2923.

This endorsement is executed by the Liberty Mutual Fire Insurance Company          16586

Premium $

Effective Date                    Expiration Date

For attachment to Policy No. WC1-111-001348-211

Countersigned by _____
                          Authorized Representative

End. Serial No. 6

**WC 00 04 21 A**
Page 1 of 1
Ed. 01/01/2006
© 2005 National Council on Compensation Insurance, Inc.

# FOREIGN TERRORISM PREMIUM ENDORSEMENT

This endorsement is notification that your insurance carrier is charging premium for losses that may occur in the event of an act of foreign terrorism.

Your policy provides coverage for workers compensation losses caused by acts of foreign terrorism, including workers compensation benefit obligations dictated by state law. Coverage for such losses is still subject to all terms, definitions, exclusions, and conditions in your policy, and any applicable federal and/or state laws, rules, or regulations.

For purposes of this endorsement, an "act of foreign terrorism" is defined as:

a. Any act that is violent or dangerous to human life, property or infrastructure; and

b. The act has been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The premium charge for the coverage your policy provides for workers compensation losses caused by an act of foreign terrorism is shown in Item 4 of the Information Page or in the Schedule below.

## Schedule

| State | Rate per $100 of payroll |
|-------|--------------------------|

Not Applicable in Florida, Massachusetts and Virginia.

This endorsement is executed by the Liberty Mutual Fire Insurance Company          16586

Premium $

Effective Date                    Expiration Date

For attachment to Policy No. WC1-111-001348-211

Countersigned by_____

Authorized Representative

End. Serial No. 7

**WC 00 04 22**
Page 1 of 1
Ed. 01/01/2006
© 2005 National Council on Compensation Insurance, Inc.

# NEW YORK LIMIT OF LIABILITY ENDORSEMENT

This endorsement applies only to the insurance provided by Part Two (Employers Liability Insurance) because New York is shown in Item 3.A. of the Information Page.

We may not limit our liability to pay damages for which we become legally liable to pay because of bodily injury to your employees if the bodily injury arises out of and in the course of employment that is subject to and is compensable under the Workers' Compensation Law of New York.

This endorsement is executed by the Liberty Mutual Fire Insurance Company          16586

Premium $

Effective Date                    Expiration Date

For attachment to Policy No. WC1 - 111 - 001348 - 211

Countersigned by_____

                                    Authorized Representative

                                    End. Serial No. 8

**WC 31 03 08**
Page 1 of 1
Ed. 04/01/1984

© 1987 New York Compensation Insurance Rating Board

## NEW YORK CONSTRUCTION CLASSIFICATION PREMIUM ADJUSTMENT PROGRAM EXPLANATORY ENDORSEMENT

The New York Construction Classification Premium Adjustment Program (NYCCPAP) allows premium credits for some employers in the construction industry. These credits exist to recognize the difference in wage rates between employers within the same construction industries in New York.

The declarations section of this policy will show a credit of 0.00% if you are not eligible for this credit, or if you are eligible for this credit and have not yet applied for a credit. Credits are earned for average wages in excess of $15.50 per hour for each eligible class. If your policy shows one of the following classification codes, and you are experience rated, you are eligible to apply for an NYCCPAP credit:

| | | | | | | |
|---|---|---|---|---|---|---|
| 0042 | 5102 | 5402 | 5506 | 5701 | 6233 | 7536 |
| 3365 | 5160 | 5403 | 5507 | 5703 | 6235 | 7538 |
| 3724 | 5183 | 5428 | 5508 | 5709 | 6251 | 7601 |
| 3726 | 5184 | 5429 | 5536 | 6003 | 6252 | 7855 |
| 3737 | 5188 | 5443 | 5538 | 6005 | 6254 | 8227 |
| 5000 | 5190 | 5445 | 5545 | 6017 | 6259 | 9526 |
| 5022 | 5193 | 5462 | 5547 | 6018 | 6260 | 9527 |
| 5037 | 5213 | 5473 | 5606 | 6045 | 6306 | 9534 |
| 5040 | 5221 | 5474 | 5610 | 6204 | 6319 | 9539 |
| 5057 | 5222 | 5479 | 5645 | 6216 | 6325 | 9545 |
| 5059 | 5223 | 5480 | 5648 | 6217 | 6400 | 9549 |
| 5069 | 5348 | 5491 | 5651 | 6229 | 6701 | 9553 |

The basis for determining the credit is the limited payroll of each employee for the number of hours worked (excluding overtime premium pay) for each construction classification (other than employees engaged in the construction of one or two-family residential housing) for the third quarter, as reported to taxing authorities, for the year preceding the policy date. Total payroll is to continue to be reported for employees engaged in the construction of one or two-family residential housing. For example:

| POLICY EFFECTIVE DATE | THIRD QUARTER PAYROLL |
|---|---|
| 4/1/05 thru 3/31/06 | 2004 |
| 4/1/06 thru 3/31/07 | 2005 |
| 4/1/07 thru 3/31/08 | 2006 |
| 4/1/08 thru 3/31/09 | 2007 |
| 4/1/09 thru 3/31/10 | 2008 |
| 4/1/10 thru 3/31/11 | 2009 |

If you have any eligible classes on your policy, you should have been notified by your insurance carrier or the New York Compensation Insurance Rating Board approximately nine months prior to the inception date of this policy. If you believe you may be eligible for a credit and have not received an application, you should immediately contact your agent, insurance carrier, or the New York Compensation Insurance Rating Board.

Credits are calculated by the New York Compensation Insurance Rating Board. You must submit a completed application to: Attention: Field Services Department, New York Compensation Insurance Rating Board, 200 East Forty-Second Street, New York, New York 10017.

**WC 31 03 19 D**
Page 1 of 2
Ed. 01/01/2007
Copyright 2007 New York Compensation Insurance Rating Board

## NEW YORK CONSTRUCTION CLASSIFICATION PREMIUM ADJUSTMENT PROGRAM EXPLANATORY ENDORSEMENT

Applications must be received by the Rating Board six (6) months prior to the policy renewal effective date. The Rating Board will accept and process an application if it is received between the policy effective and expiration date, however, it must be accompanied by a letter stating the reason for the delay. Under no circumstances will an application be accepted for any policy if it is received after the expiration date of the policy. For short-term policies the application must be received prior to the expiration date of the short-term policy. If it is received after the policy expiration, no credit will be received.

The New York Workers Compensation and Employers Liability Insurance Manual, and not this endorsement, govern the implementation and use of the NYCCPAP.

This endorsement is executed by the Liberty Mutual Fire Insurance Company          16586

Premium $

Effective Date                    Expiration Date

For attachment to Policy No. WC1-111-001348-211

Countersigned by_____
                                              Authorized Representative

                                       End. Serial No. 9

**WC 31 03 19 D**
Page 2 of 2
Ed. 01/01/2007
Copyright 2007 New York Compensation Insurance Rating Board

# NEW YORK PENDING PAYROLL LIMITATION AND PREMIUM DIFFERENTIAL ENDORSEMENT

The Construction Employment Payroll Limitation Law (S7744/A11294) requires a payroll limitation and territory premium differential on policies for all employers subject to the Law with an anniversary rating date on or after October 1, 1999. **The code(s) currently on your policy may be subject to the Law.**

The requirements of the Law may be applied during the policy period or may be applied at time of audit.

This endorsement is executed by the Liberty Mutual Fire Insurance Company 16586

Premium $

Effective Date                 Expiration Date

For attachment to Policy No. WC1-111-001348-211

Countersigned by_____

Authorized Representative

End. Serial No. 10

WC 31 04 04
Page 1 of 1
Ed. 10/1999

# EXHIBIT 2

STATE OF NEW YORK
SUPREME COURT                    COUNTY OF ALBANY
_____

                        Application of

WILLIAM HELD, JR., as Chairman of Contractors Compensation
Trust; ALFRED LAVKER, as Chairman of Cooperative Association
of Food Enterprises Workers' Compensation Trust; JOHN S. KOGET,
as Chairman of THE ELEC-CON TRUST; GERALD O. SILVER, as
Chairman of Empire State Education Trust; JOSEPH SCARING, as
Chairman of Empire State Hospitality Workers' Compensation Trust;
GREGORY F. DeLORENZO, as Chairman of Empire State
Transportation Workers' Compensation Trust; FLOYD HUNTZ, as
Chairman of First Automotive Services Trust; JOHN SHERMAN, as
Chairman of NYSARC Workers' Compensation Trust; JOHN D.
MANISCALCO and THOMAS J. PETERS, as Co-Chairman of New
York Petroleum Associations Compensation Trust; PAUL ROSS, as
Chairman of New York McDonald's Operators Worker's
Compensation Trust; JAMES R. PIETROPAOLI, as Chairman of NY
Transportation Workers' Compensation Trust; JOHN MacDOUGALL,
as Chairman of Retailers of New York Workers' Compensation Trust;
and KENNETH MONTERA, as Chairman of The Selective Safety
Trust,

                                              **DECISION/ORDER/JUDGMENT**

                        Petitioners,

                                              Index No.: 2957-08
                                              RJI No.: 01-08-ST8743

KEVIN MURPHY, as Chairperson of NYAHSA Services, Inc. Self
Insurance Trust, TODD BRASON, as Chair of the Health Care
Providers Self-Insurance Trust, and JANICE M. JOHNSON, Chair of
the Community Residence Insurance Savings Plan (CRISP) Self-
Insurance Trust,

                                    Intervenor Petitioners,

For a Judgment Pursuant to New York CPLR
Article 78

              -against-

STATE OF NEW YORK WORKERS' COMPENSATION
BOARD, and ZACHARY S. WEISS, as Chairman of the
Workers' Compensation Board,

                        Respondents.

(Supreme Court, Albany County, Special Term)

(Justice Kimberly A. O'Connor, Presiding)

APPEARANCES:        PATTERSON BELKNAP WEBB
                     & TYLER LLP
                     Attorneys for Petitioners
                     (Stephen P. Younger and
                     Ella Campi, Esqs., of Counsel)
                     1133 Avenue of the Americas
                     New York. New York 10036

PHILLIPS LYTLE LLP
Attorneys for Petitioners[1]
(Kenneth A. Manning, Craig R. Bucki,
and Sean C. McPhee, Esqs., of Counsel)
One HSBC Center, Suite 3400
Buffalo, New York 14203-2887

PHILLIPS LYTLE LLP
Attorneys for Petitioners[1]
(Richard E. Honen and
Kelly Mooney Lester, Esqs., of Counsel)
Omni Plaza, 30 South Pearl Street
Albany, New York 12207

BOND, SCHOENECK & KING, PLLC
Attorneys for Intervenor Petitioners
NYAHSA Services, Inc. Self Insurance Trust
and Community Residence Insurance Savings
Plan Self-Insurance Trust
(Hermes Fernandez and Stuart F. Klein, Esqs.,
of Counsel)
111 Washington Avenue
Albany, New York 12210-2211

---

[1] Philips Lytle LLP is co-counsel for all petitioners except NYSARC Workers' Compensation Trust.

WHITEMAN OSTERMAN & HANNA, LLP
Attorneys for Intervenor Petitioner Health Care
Providers Self-Insurance Trust
(John P. Calareso, Jr., Esq., of Counsel)
One Commerce Plaza
Albany, New York 12260

HON. ANDREW M. CUOMO
Attorney General of State of New York
Attorney for Respondents
(Richard Lombardo and Douglas J. Goglia,
Assistant Attorneys General, and
Robert M. Goldfarb, Assistant Solicitor
General, of Counsel)
The Capitol
Albany, New York 12224

COLLERAN, O'HARA & MILLS, LLP
Attorneys for the New York State AFL-CIO
(Edward J. Groarke, Esq., of Counsel)
1225 Franklin Avenue, Suite 450
Garden City, New York  11530

MACKENZIE HUGHES LLP
Attorneys for the Special Trades Contracting
and Construction Trust
(Edward J. Moses, Esq., of Counsel)
101 South Salina Street, Suite 600
P.O. Box 4967
Syracuse, New York 13221-4967

O'CONNOR, J.:

Petitioners, thirteen group self-insured trusts, commenced the instant CPLR Article 78

proceeding (and companion declaratory judgment action) to challenge the authority of respondent

New York State Workers' Compensation Board ("Board") to levy certain assessments against them

pursuant to Workers' Compensation Law § 50(5). On consent of the parties and by Orders of this

Court, executed May 16, 2008 and May 23, 2008, three additional group self-insured trusts have

3

intervened as petitioners in this proceeding. The New York State AFL-CIO and the Special Trades Contracting and Construction Trust appear as *amicus curiae*.

## BACKGROUND

Some initial review of the relevant statutory and regulatory scheme is necessary to frame the facts of this proceeding. Section 50 of the Workers' Compensation Law ("WCL") requires all employers in the State of New York to provide coverage for workers' compensation benefits to their employees. Pursuant to the WCL, there are three methods of providing workers' compensation coverage to employees. An employer may: (1) purchase a workers' compensation insurance policy from the State Insurance Fund (*see* WCL § 50[1]); (2) purchase a workers' compensation insurance policy from an insurance carrier authorized to transact business in New York State (*see* WCL § 50[2]); or (3) self-insure as an individual or as a member of a group (*see* WCL § 50[3] and § 50[3-a]).

WCL § 50(3-a) provides the method by which employers in New York State may secure workers' compensation benefits for their employees through group self-insurance. Pursuant to WCL § 50(3-a), employers performing related activities in a given industry may adopt a plan for self insurance as a group to provide coverage for workers' compensation benefits to their employees. The legal entities formed thereunder are denominated group self-insurance trusts ("GSIT"), and there must exist "a homogeneity in the nature of the group members' business activities" to qualify to operate as a GSIT (12 N.Y.C.R.R. § 317.2[l]; *see also* 12 N.Y.C.R.R. § 317.3[a]).

Under the plan, each employer member of the GSIT contractually agrees to assume the workers' compensation obligations of each associated member (*see* WCL § 50[3-a][2]; *see also* 12 N.Y.C.R.R.

4

§ 317.2[i]). That is, "each employer member of a GSIT agrees to be jointly and severally liable for the liabilities of the GSIT as a whole" (Pet. Ex. A at 3). As such, an employer participating in a GSIT is not relieved from liability for compensation prescribed by the WCL except by payment thereof by the GSIT or by the employer itself (see WCL § 50[3-a][3]).

Pursuant to the WCL, each GSIT is required to "furnish satisfactory proof to the [Board] chairman of its financial ability to pay [workers'] compensation for the employers in the industry covered by it, its revenues, their source and assurance of continuance" (WCL § 50[3-a][2]). GSITs accomplish this by depositing with the chairman securities or cash, or filing irrevocable letters of credit and/or a surety bond in an amount jointly determined by the chairman of the Board and the superintendent of insurance to secure their liability to pay the compensation of each employer member of the GSIT (see id; see also WCL § 50[5][d]). In addition to the statutory requirements, the promulgated regulations set forth the application procedures, qualifications, and responsibilities of GSITs (see 12 N.Y.C.R.R. § 317 et seq.).

The New York State Workers' Compensation Board is the governmental entity charged, inter alia, with administering the provisions of the WCL and attendant regulations pertaining to workers' compensation benefits. As a self-funded agency, the Board's administrative expenses are recouped through annual assessments on the participants in the workers' compensation system. Under WCL § 50(5)(c), the Board is authorized to levy an assessment against all self-insurers, both individual and group, for general administrative expenses[2] and for all other direct or indirect costs incurred by the Board during the preceding fiscal year in administering the self-insurance program. Furthermore,

---

[2] These expenses include the direct costs of personal services, the cost of maintenance and operation, the cost of retirement contributions made and workers' compensation premiums paid by the State for or on account of personnel, and rentals for space occupied in state-owned or state-leased buildings.

5

"[w]henever the chairman [of the Board] shall determine that the compensation and benefits provided by [the WCL] may be unpaid by reason of the default of an insolvent private self-insured employer and the penal sum of the surety bond and[/]or the securities or irrevocable letters of credit or cash held on its behalf by the chairman are about to become exhausted," the chairman is authorized pursuant to WCL § 50(5)(f)[3] to "levy an assessment against all private self-insured employers."

Assessments levied by the Board pursuant to WCL § 50(5)(c) and § 50(5)(f) are allocated against each self-insurer, individual and GSIT, using a "pure premium" calculation (*see* WCL § 50[5][c]). The "pure premium" calculation is the result of a statutory amendment to § 50(5)(c), which took effect on January 1, 2008. As part of the Workers' Compensation Reform Bill, signed into law in March of 2007, the Legislature changed the assessment methodology for § 50(5) assessments from a security deposit calculation to a "pure premium" calculation. Under the former, § 50(5) assessments were allocated between individual self-insurers and GSITs on the basis of the relative proportion of surety bonds pledged to the Board. Under the new methodology, the basis of apportionment of the assessment against each self-insurer is a sum equal to that proportion of the amount which the "pure premium" calculation for each self-insurer bears to the total "pure premium" calculation for all self-insurers (*id.*). "Pure premium calculation" is defined in § 50(5)(c) as the New York State annual payroll as of December 31st of the preceding year by class code for each individual self-insurer or employer member of a GSIT multiplied by the applicable rate for each

---

[3] The Court notes that WCL § 50(5) includes two paragraphs "(f)." The second paragraph (f) of WCL § 50(5) is the provision at issue in this proceeding. All references to WCL § 50(5)(f) as used herein are to the second paragraph (f).

6

class code as determined by the workers' compensation rating board in effect on December 31st of the preceding year (*id.*).

*2008 Assessments*

Each of the petitioners and intervenor petitioners in this proceeding is a GSIT established pursuant to WCL § 50(3-a) and the promulgated regulations, and administered by a third-party administrator pursuant to an administration agreement. On February 11, 2008, the Board chairman sent each petitioner and intervenor petitioner a Notice of Assessment, demanding the first quarterly installment of the § 50(5) assessments, comprising both the § 50(5)(c) assessment and the § 50(5)(f) assessment.[4] According to petitioners, their annual assessments for 2008 total more than $11 million collectively, and represent an increase of more than 8,000% over the Board's 2007 § 50(5) assessments. Intervenor petitioners contend that their annual assessments total more than $2.5 million collectively, and represent an approximate increase of 2,386%, 4,000%, and 11,000% respectively from the Board's 2007 § 50(5) assessments.

By letter dated February 15, 2008, petitioners, through their third party administrator, disputed the 2008 § 50(5) assessments levied against them, and requested: (1) an explanation of the statutory and regulatory bases for the assessments; (2) an itemization of expenses included within the assessments; and (3) access to the Board's records supporting the allocation of assessments (*see* Pet. Ex. D). Subsequent letters, dated March 10, 2008, were sent to the Board by petitioners' third party administrator "requesting written follow-up on the authority and support for the significant assessments" and "a meeting [to discuss] the recent 50-5 assessments" (*see* Pet. Exs. E & F). Petitioners' records access request was denied by letter of the Board dated March 17, 2008, and

---

[4] The record shows that <u>all</u> private self-insured employers were subject to these assessments.

7

payment of the subject assessments was demanded. By the same letter, petitioners were advised that failure to remit payment of the 2008 assessments would result in "whatever action [the Board] deems necessary including, but not limited to, immediately drawing upon the security posted by the [GSIT] . . . and/or moving to revoke the [GSIT's] authority to operate as a group self-insurer . . . ." (*see* Pet. Ex. G). This proceeding followed.

Petitioners made a motion to stay enforcement of the 2008 § 50(5) assessments levied against them pending the Court's determination of the petition in this proceeding. The parties agreed to a voluntary stay through the return date of the application. Oral argument was heard on the motion on May 1, 2008, and a temporary stay was granted by Decision and Order of this Court, dated May 2, 2008, as to the enforcement of the portion of the assessments that had been imposed by the Board pursuant to WCL § 50(5)(f). Petitioners, however, were directed to pay the portion of the 2008 assessments levied pursuant to WCL § 50(5)(c)–the general administrative expenses–which were not in dispute and are not the subject of this proceeding. Petitioners have paid their § 50(5)(c) general assessments in full. Intervenor petitioners have paid in full the first quarterly installments of their 2008 § 50(5)(c) and § 50(5)(f) assessments.[5]

Oral argument was held on May 1, 2008 and May 23, 2008 in connection with this proceeding. The papers are fully submitted, and all issues have been fully briefed.

---

[5] Intervenor petitioners second quarterly installment was due in May 2008, and collectible by the Board as intervenor petitioners were not subject to the stay of enforcement in this proceeding. Intervenor petitioners assert that their payments of the challenged assessments have been made under protest, and do not constitute a concession that the assessments levied against them pursuant to WCL § 50(5)(f) are lawful.

## ARGUMENTS

*Petitioners' and Intervenor Petitioners' Contentions*

By their petitions, petitioners and intervenor petitioners argue that the 2008 WCL § 50(5)(f) assessments levied against them by the Board are unlawful and should, therefore, be annulled and vacated on the grounds that: (1) the § 50(5)(f) assessments are infected by an error of law; (2) the Board's application of the § 50(5)(c) "pure premium" calculation was arbitrary and capricious, and without a rational basis; and (3) the assessments violate their federal and state constitutional rights. Petitioners further assert claims that the Board acted in an arbitrary and capricious manner, and abused its discretion by refusing to make open for public inspection by petitioners certain records pertaining to and supporting the imposition of the § 50(5)(f) assessments against GSITs, and the bases and methods for the allocation of those expenses to the petitioners.

By this proceeding, petitioners and intervenor petitioners seek a judgment: (1) declaring that the portion of the 2008 WCL § 50(5) assessments levied by the Board against them pursuant to § 50(5)(f), which includes monies for the anticipated liabilities or other losses for defaulted GSITs, is invalid as having been made in excess of the respondents' statutory and/or regulatory authority; (2) annulling and vacating the § 50(5)(f) assessments imposed by the Board against petitioners and intervenor petitioners until they are correctly recalculated without including monies for defaulted GSITs, and made with a reasonable basis for allocating the Board's expenses between individual self-insurers and GSITs; (3) granting petitioners' access to the books and records of the Board that are related to the challenged assessments; (4) financially reimbursing intervenor petitioners for the portion of the 2008 § 50(5) assessments they paid in full, which included the losses, liabilities, and expenses, anticipated or actual, of defaulted GSITs; (5) barring respondents from taking any adverse

9

action against petitioners, intervenor petitioners, or their third party administrators based, in whole or in part, on the actions of the petitioners and intervenor petitioners in challenging and withholding portions of the Board's 2008 § 50(5) assessments, and the denial of petitioners' access through its third party administrator to the Board's books and records; and (6) granting such other and further relief as the Court deems just and proper.

### Error of Law Claims

Petitioners and intervenor petitioners allege that the Board lacks statutory and regulatory authority to assess healthy GSITs for the anticipated losses, liabilities, and expenses of defaulted GSITs because: (1) WCL § 50(5)(f) authorizes the Board chairman to levy assessments only for losses that have actually been incurred in connection with "an insolvent private self-insured employer"; it does not authorize assessments for potential or prospective liabilities of a defaulted GSIT; (2) the statutory and regulatory scheme creating GSITs limits the liability of the employer members of a GSIT to the workers' compensation obligations of that particular GSIT: the scheme does not support assessments for the obligations of other unrelated GSITs; (3) WCL § 50(5)(f) applies only to "private self-insured employers" (i.e., individual self-insurers) and not to GSITs; and (4) WCL § 50(5)(d) provides the sole method for the Board to address GSIT insolvency.[6]

Petitioners and intervenor petitioners further contend that even if the Board had statutory authority to levy the WCL § 50(5)(f) assessments, such assessments are nonetheless invalid because: (1) the Board failed to promulgate reasonable rules and regulations, as required by § 50(3-a)(6), authorizing the Board to assess healthy GSITs for the workers' compensation liabilities of defaulted

---

[6] Intervenor petitioners do not assert this argument in their petitions.

GSITs; and (2) the Board did not meet the statutory prerequisites of § 50(5)(f) before imposing the assessments.

### "Pure Premium" Calculation Claim

Petitioners and intervenor petitioners assert that the Board's implementation of the 2007 amendment to WCL § 50(5)(c), prescribing the "pure premium" calculation as the method for allocating § 50(5) assessments amongst both individual self-insurers and GSITs, was arbitrary and capricious, and without a rational basis. Specifically, they argue that the Board has not set forth any rational basis to calculate the "pure premium" of individual self-insurers, and does not have a rational process for accurately implementing the "pure premium" calculation method as to all self-insurers. Thus, petitioners and intevenor petitioners contend that the "pure premium" calculation the Board uses in apportioning the § 50(5) assessments between individual self-insurers and GSITs is materially misstated.

### Constitutional Claims

Petitioners and intervenor petitioner NYAHSA allege that the Board's WCL § 50(5)(f) assessments violate their federal and state constitutional rights under the due process clause, the takings clause, and the contracts clause. They argue that these assessments violate their due process rights because WCL § 50 lacks the requisite clarity to apprise them of their potential for liability for the obligations of other GSITs, and is ambiguous as to the application of the assessment mechanism in § 50(5)(f). Furthermore, petitioners and intervenor petitioner NYAHSA contend that because the § 50(5)(f) assessments create an inequality in the burden imposed without conferring a benefit, such assessments, if enforced, constitute a taking of property without just compensation within the meaning of the takings clause, further abridging their due process rights. Finally, petitioners and

11

intervenor petitioner assert that the challenged assessments violate their rights under the contracts clause because the assessments severely impair their obligations under their respective trust agreements, and are an unreasonable and inappropriate means to ensure that the workers' compensation claims made against members of defaulted GSITs are paid.

Intevenor petitioners also allege that the Board acted in an arbitrary and capricious manner by levying the § 50(5)(f) assessments only against individual self-insurers and GSITs, and not imposing these assessments upon public employers, self-insuring either individually or as a member of a GSIT exclusively made up of public employers. They argue that this selective assessment lacks any rational basis, and is in violation of the equal protection clause because: (1) the only basis for this treatment is respondents' claim that public self-insurers cannot default on their workers' compensation obligations since they have taxing authority; (2) the need for the assessment is not due to the default of the assessed self-insurer; and (3) a public self-insurer can default on its workers' compensation obligations.

### Petitioners' Remaining Claims

Petitioners charge the Board with acting in an arbitrary and capricious manner, and abusing its discretion by refusing to disclose for inspection by petitioners an itemization of the costs and expenses included in the WCL § 50(5)(f) assessments; support for the anticipated losses, liabilities, and expenses of the defaulted GSITs, including recent financial statements of the defaulted GSITs; collection efforts undertaken by the Board against the defaulted GSITs to secure their workers' compensation obligations, including billings, if any, imposed upon the members of the defaulted GSITs for the anticipated losses, liabilities, and expenses expected to be disbursed by the Board on

12

their behalf; and the bases and methods for the allocation of those expenses to the petitioners, including but not limited to, the derivation of the "pure premium" allocation.

*Respondents' Opposition*

By their opposition, respondents raise two objections in point of law, and seek dismissal of the petitions on the grounds that the claims advanced by petitioners and intervenor petitioners are entirely without merit. Specifically, respondents contend that: (1) the Board's construction of WCL § 50(5)(f) is reasonable and should be upheld because the Board is interpreting a statute that it drafted and proposed, and the issues in this proceeding implicate the Board's special competence in its administration of the statute; (2) the Legislature intended § 50(5)(f) to apply to all "private self-insured employers," including those employers self-insuring individually under § 50(3) as well as those employers self-insuring as a group under § 50(3-a), exempting only those public employers that self-insure as individuals or as part of a group comprised exclusively of public employers; (3) the plain language of the statute authorizes § 50(5)(f) assessments against GSITs for the anticipated losses, liabilities, and expenses of other defaulted, insolvent GSITs; (4) WCL § 50(5)(f) assessments do not contravene and/or conflict with the statutory and regulatory scheme creating GSITs; (5) WCL § 50(5)(d) does not limit the assessment provisions set forth in § 50(5)(f), but rather provides an alternative, discretionary means to ensure the financial abilities of GSITs; and (6) the Board is not required to promulgate a rule or regulation restating its statutory authority to assess GSITs for the workers' compensation obligations of other defaulted GSITs.

Respondents also argue that the Board's basis for the "pure premium" calculation is set forth in WCL § 50(5)(c), and that the exact same calculation is used for individual self-insurers as well as GSITs. Moreover, respondents assert that the Board did not violate petitioners' and intervenor

petitioners' due process rights and/or their rights under the contracts clause, takings clause, and equal protection clause of the federal and state constitutions. The Board contends that: (1) legislative enactments are entitled to a strong presumption of constitutionality; (2) WCL § 50(5)(f) was enacted to cure what the Legislature perceived to be a significant social and economic problem–to ensure that eligible claimants would receive workers' compensation benefits to which they are entitled, notwithstanding the default of an insolvent private self-insured employer; (3) WCL § 50(5)(f) is clear and unambiguous, and sufficiently places GSITs on notice as to their obligations to pay their share of the Board's administration expenses, which includes amounts the Board may pay as compensation and benefits for a defaulted private self-insured employer; and (4) the Board's actions in imposing the § 50(5)(f) assessments serve a legitimate public purpose, and are a reasonable and necessary means to accomplish such purpose.

Finally, respondents argue that petitioners' claims that the Board acted in an arbitrary and capricious manner, and abused its discretion by refusing to make open for public inspection by petitioners certain records pertaining to and supporting the imposition of the WCL § 50(5)(f) assessments against GSITs, and the bases and methods for the allocation of those expenses to the petitioners should be dismissed because of petitioners' failure to exhaust their administrative remedies.

*Recent Legislative Activity*

It should be noted that recent legislation was passed and signed into law that will alter this area of the Workers' Compensation Law, including some of the provisions specifically at issue in this proceeding (*see* Governors' Program Bill No. 70; S. 8708/A.11756). While petitioners, intervenor petitioners, and respondents have written to this Court extensively, after the papers in this

14

case were fully submitted, regarding the impact that these changes in the law may have on this proceeding, the majority of the amendments to the existing law are irrelevant to this proceeding. Additionally, any ambiguity in the effective date and any possible retroactive application of these changes in the law have no bearing on this proceeding, as will be more fully described herein.

## DISCUSSION

"Courts have rarely singled out 'error of law,' by name, as a question for consideration in an Article 78 proceeding" (Alexander, Practice Commentaries, McKinney's Cons. Laws of N.Y., Book 7B, CPLR 7803:1, at 353). The question of whether an administrative agency's determination is affected by an error of law is often implicit in the nature of the grievance, and will often turn on the underlying substantive law applicable to the determination (*id.*; *see also* 14 Weinstein-Korn-Miller, N.Y. Civ. Prac. ¶ 7803.01[3]). For example, if an agency improperly interprets or applies a statute or regulation, the determination may be affected by an error of law (*see* Weinstein-Korn-Miller, *supra*; *see also* Alexander, *supra*).

As a general matter, an agency's interpretation of the statutes and regulations that it is charged with administering will be upheld if the question before the court involves the agency's special competence or expertise (*see* Weinstein-Korn-Miller, *supra*), and there has been no showing that the agency's interpretation is irrational or unreasonable (*see Lorillard Tobacco Co. v. Roth*, 99 N.Y.2d 316, 322 [2003]; *see also Seittelman v. Sabol*, 91 N.Y.2d 618, 625 [1998]). If, however, on the facts presented, "the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the . . . agency" (*Lorillard Tobacco Co. v. Roth*, *supra*; *see also Price Chopper*

15

*Operating Co. v. New York State Liquor Authority*, Slip. Op. 04987, 2008 WL 2278114, *2 [3d Dep't 2008]; *see also Kurcsics v. Merchants Mut. Ins. Co.*, 49 N.Y.2d 451, 459 [1980]).

The main question before the Court in this proceeding is whether the Board had legal authority to assess healthy GSITs, including petitioners and intervenor petitioners, for the anticipated losses, liabilities, and expenses of defaulted GSITs. If the law confers this authority on the Board, the Court must then determine whether that authority has been properly exercised under the facts presented in this case. Essential to these determinations is a review of the language of WCL § 50, particularly the assessment provisions set forth in WCL § 50(5)(f), and the interpretation and resulting application of those provisions.

"The governing rule of statutory construction is that courts are obliged to interpret a statute to effectuate the intent of the Legislature" (*People v. Finnegan*, 85 N.Y.2d 53, 58 [1995]). Since "the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself" (*Price Chopper Operating Co., supra* [citing *Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577, 583 [1998]; *see also Matter of Kern v. New York State Dept. of Civ. Serv.*, 288 A.D.2d 674, 676 [3d Dep't 2001]). Thus, "[w]here the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used" (*Wise v. Jennings*, 290 A.D.2d 702, 703 [3d Dep't 2002] [quoting *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 41 N.Y.2d 205, 208 (1976)] [internal quotations and citations omitted]).

WCL § 50(5)(f) provides, in relevant part, as follows:

Whenever the chairman shall determine that the compensation and benefits provided by this chapter may be unpaid by reason of the default of an insolvent private self-insured employer and the penal sum of the surety bond and[/]or the securities or irrevocable letters of credit or cash held on its behalf by the chairman are about to

16

become exhausted, the chairman shall levy an assessment against all private self-insured employers in accordance with paragraphs c and e of this subdivision to assure prompt payment of such compensation and benefits.

Initially, the Court finds that the language of WCL § 50(5)(f) is clear and unambiguous on its face. As such, the Court will construe it so as to give effect to the plain meaning of the words used. Applying the principles of statutory construction, the Court finds that upon a plain reading of § 50(5)(f) considered in light of the relevant legislative history, attendant regulations, and the provisions of § 50 as a whole, the Legislature's use of the term "private self-insured employer" evidences its intent that such provision apply to all non-public self-insurers, including individual self-insured employers and GSITs.[7]

There has been a great deal of treatment in the record before the Court regarding the use of the terms "private" and "employer" as they relate to legislative intent, the statutory and regulatory scheme of individual and group self-insurance, and the assessments at issue in this proceeding. The statutory and regulatory scheme, together with the relevant legislative history, supports use of the term "private" and "employer" in the context of the self-insurance program, and more specifically, in WCL § 50, as referring to both individual self-insurers and GSITs. Furthermore, the term "private" is meant to distinguish non-public individual employers self-insuring under the provisions of § 50(3) and non-public employer groups self-insuring under the provisions of § 50(3-a), from public employers self-insuring individually pursuant to the provisions of § 50(4) or as a group exclusively made up of public employers pursuant to the provisions of § 50(3-a). Thus, the term "private self-insured employer," as contemplated by the Legislature, includes non-public individual self-insured employers and GSITs, comprising non-public employers only as well as GSITs that

---

[7] A public employer that is part of a GSIT, comprising both private employers and public employers, is subject to the provisions of WCL § 50(5)(f).

17

include both public and non-public employers. As such, these "private self-insured employers" are subject to WCL § 50(5)(f) assessments.

Notwithstanding the petitioners' and intervenor petitioners' arguments to the contrary, the Court further finds that the language of the statute expressly confers upon the Board the authority to assess all private self-insurers for the anticipated losses, liabilities, and expenses of defaulted GSITs. Respondents' contentions that recent changes in the law clarify this issue and that such changes should be applied retroactively are rendered academic as this Court has determined that this provision, prior to the change in the law, applies to all private self-insurers.

However, for the reasons that follow, the Court finds that the Board improperly exercised its authority in levying the WCL § 50(5)(f) assessments. Section 50(5)(f) sets forth conditions precedent to the imposition of an assessment. Specifically, the Board is only authorized to levy an assessment after the chairman has determined that claims may go unpaid "by reason of the default of an insolvent private self-insurer and that the penal sum of the surety bond and[/]or the securities or irrevocable letters of credit or cash held on its behalf by the chairman are about to become exhausted" (emphasis added). Insolvency must be real and actual prior to imposing the assessment, not prospective or speculative. This is clear from the legislative history surrounding the enactment of this provision. Furthermore, it must be demonstrated that the penal sum of the surety bond and/or securities, irrevocable letters of credit, or cash held by the chairman on behalf of the self-insurer are about to become exhausted.

The Court finds merit in petitioners' and intervenor petitioners' claim that the Board failed to comply with the statutory requirements of WCL § 50(5)(f) prior to levying assessments against them. The record shows that the § 50(5)(f) assessments being challenged in this proceeding are

18

attributable to the losses, liabilities, and expenses of nine defaulted GSITs. Respondents contend that of the nine defaulted GSITs, the Board is currently making claims payments on behalf of six because they are financially unable to do so, and thus are "clearly insolvent." Respondents also contend that the Board has either called or will shortly call in the security deposits of each of the nine defaulted GSITs, and that the security deposits of these GSITs have been liquidated or are expected to be liquidated shortly.

Other than the entirely conclusory assertions set forth in the self-serving affidavits of Mary Beth Woods,[8] submitted on behalf of respondents in support of their position in this proceeding, there is nothing in the record before the Court which establishes that the six defaulted GSITs are in fact insolvent. Furthermore, respondents admit that the remaining three defaulted GSITs "are expected to become insolvent within months," which is supported by the record. Moreover, the Court rejects respondents' suggestion that total insolvency is neither a requirement of nor a condition precedent to the levying of an assessment pursuant § 50(5)(f). Finally, respondents have failed to demonstrate to this Court's satisfaction, and there is nothing in the record before the Court to establish, that the posted security held by the chairman on behalf of the nine defaulted GSITs are about to become exhausted.

Under these circumstances, the Court finds that the challenged assessments are based upon a flawed interpretation of the relevant provisions of WCL § 50(5)(f). As such, the Board's determination to levy these assessments was affected by an error of law.

---

[8] Ms. Woods is the Director of Licensing for the Board. She oversees the Board's Office of Self-Insurance and is responsible for authorizing both individual self-insurers and GSITs, assisting in determining the Board's annual operating expenses attributable to the self-insurance program, and assisting in the "pure premium" calculation set forth in WCL § 50(5)(c).

19

The Board's application of the WCL § 50(5)(c) "pure premium" calculation, however, was not arbitrary and capricious, and thus was rationally based. An action is arbitrary and capricious when it is "taken 'without sound basis in reason and . . . without regard to the facts'" (*Matter of Konski Eng'rs. P.C. v. Levitt*, 69 A.D.2d 940, 942 [3d Dep't 1979] [quoting *Matter of Pell v. Bd. of Educ. of Union Free Sch. Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 N.Y.2d 222, 231 (1974)]; *accord Matter of Heintz v. Brown*, 80 N.Y.2d 998, 1001 [1992]; *see also Matter of Grella v. Hevesi*, 38 A.D.3d 113, 116 [3d Dep't 2007]). The court's "function is limited to whether the administrative action may be supported on any rational basis" (*Matter of C.K. Rehner, Inc. [City of New York]*, 106 A.D.2d 268, 270 [1st Dep't 1984]), and the court may not disturb factual determinations (*see Matter of Heintz v. Brown, supra*), weigh the evidence (*see Matter of Pell v. Bd. of Educ. of Union Free Sch. Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, supra*, at 230), or substitute its judgment for that of the administrative official (*see id.* at 230-31).

In the present case, the basis for the "pure premium" calculation is expressly set forth in WCL § 50(5)(c) as described above. Furthermore, the "pure premium" calculation is used to apportion § 50(5) assessments against all private self-insurers. In light of the statutory basis for the "pure premium" calculation, and notwithstanding petitioners' and intervenor petitioners' arguments pertaining to the accuracy of the "pure premium" calculation method as applied to all private self-insurers, including individual self-insurers and GSITs, the Court finds that the Board's use of the "pure premium" calculation in allocating the 2008 WCL § 50(5) assessments was neither arbitrary nor capricious and, therefore, will not be disturbed (*see Crest Mainstream, Inc. v. Mills*, 257 A.D.2d 969, 971 [3d Dep't 1999]).

20

Furthermore, it is well settled that "an [A]rticle 78 proceeding may not be used to test the constitutionality of a legislative enactment" (*Bd. of Ed. of Belmont Cent. Sch. Dist. v. Gootnick*, 49 N.Y.2d 683, 687 [1980]; *see also R & G Outfitters, Inc. v. Bouchard*, 101 A.D.2d 642, 643 [3d Dep't 1984]). However, "it is the proper method for the determination of whether a statute in a specific instance has been applied in an unconstitutional manner" (*R & G Outfitters, Inc. v. Bouchard, supra*; *see also Kovarsky v. Hous. & Dev. Admin. of City of New York*, 31 N.Y.2d 184, 191 [1972]).

As the constitutional due process, takings, and contracts clause claims raised by petitioners and intervenor petitioner NYAHSA present questions concerning the constitutionality of WCL § 50(5)(f) itself, the Court is unable to address these claims in this proceeding.[9] To the extent that intervenor petitioners' equal protection claim can be determined herein, the Court finds such claim to be without merit.

Finally, petitioners claims that the Board acted in an arbitrary and capricious manner, and abused its discretion by refusing to make open for public inspection by petitioners certain records pertaining to and supporting the imposition of the WCL § 50(5)(f) assessments against GSITs, and the bases and methods for the allocation of those expenses to the petitioners are moot. These claims were also advanced in a separate application to the Court, and decided by Decision and Order, dated June 18, 2008.

All remaining contentions raised by the parties' in this proceeding have been considered and found to be without merit.

Despite this Court's determination that the assessment provisions under WCL § 50(5)(f) apply to GSITs, and that the Board did not satisfy the statutory prerequisites under that provision of

---

[9] The constitutional issues raised herein have also been asserted in petitioners' companion declaratory judgment action. Intervenor petitioners are not parties to that action.

law, the issues that have been raised in the companion declaratory judgment action persist and could not be determined in the limited context of this proceeding. The statutory scheme at issue in these cases presents a significant question that must be sorted out in order to ensure that all members of GSITs, all insurers of GSITs, the State of New York, the Workers' Compensation Board, and all taxpayers are aware of the obligations that arise in the situation created by GSITs that are in default. The provisions establishing the GSITs and the provisions authorizing the imposition of assessments in the case of defaulted GSITs appear to be inconsistent, and if such inconsistency is established in the context of the related action, a conundrum has been presented that has realistic and significant implications for all concerned.

Accordingly, in light of the foregoing, it is hereby

**ORDERED AND ADJUDGED**, that the petition and intervenor petitions are granted to the extent that the 2008 assessments levied by the Board against petitioners and intervenor petitioners pursuant to Workers Compensation Law § 50(5)(f) are annulled and vacated, and are otherwise denied; and it is further

**ORDERED AND ADJUDGED**, that the Workers' Compensation Board shall take action consistent with this Decision and Judgment.

This memorandum shall constitute the Decision, Order and Judgment of the Court. All papers, including this Decision, Order and Judgment, are being returned to the attorneys for petitioners. The signing of this Decision, Order and Judgment shall not constitute entry or filing under CPLR 2220. Counsel is not relieved from the applicable provisions of that rule relating to filing, entry, and notice of entry.

**SO ORDERED AND ADJUDGED.**

22

ENTER.

Dated: July 7, 2008
      Albany, New York

                              _Kimberly A. O'Connor_
                           HON. KIMBERLY A. O'CONNOR
                            Acting Supreme Court Justice

Papers Considered:

1.    Verified Petition, dated April 9, 2008, with Exhibits A-H annexed; Affidavit of Craig R. Bucki, Esq., sworn to April 8, 2008, with Exhibits A-E annexed; Affidavit of Sean C. McPhee, Esq., sworn to April 7, 2008; Affidavit of Richard S. Flaherty, sworn to April 9, 2008, with Exhibits A-D annexed; Affidavit of Thomas J. Peters, sworn to April 8, 2008; Affidavit of John D. Maniscalco, sworn to April 8, 2008; Affidavit of Gerald O. Silver, sworn to April 7, 2008; Affidavit of David R. Bauer, sworn to April 2, 2008; Affidavit of Charles E. Hock, sworn to April 2, 2008, with Exhibits A-C annexed;

2.    Petitioners' Memorandum of Law, April 8, 2008;

3.    Verified Answer, dated May 15, 2008; Affidavit of Mary Beth Woods, sworn to May 15, 2008, with Exhibits A-P annexed;

4.    Respondents' Memorandum of Law, dated May 15, 2008;

5.    Intervenor Petition (NYAHSA), verified May 20, 2008; Affirmation of Kevin Murphy, sworn to May 20, 2008; Intervenor Petitioner's Memorandum of Law, dated May 20, 2008;

6.    Intervenor Petition (CRISP), verified May 29, 2008; Affidavit of Janice M. Johnson, sworn to May 29, 2008;

7.    Verified Intervenor Petition (HCPSIT), dated May 29, 2008; Affidavit of Todd Brason, sworn to May 28, 2008;

8.    Affidavit of Mary Beth Woods, sworn to May 22, 2008, with Exhibits Q-S annexed; Memorandum of Law in Reply to Intervenor Petitioner's (NYAHSA) Memorandum of Law, dated May 22, 2008;

9.    Affirmation of Christopher R. Mason, Esq., dated May 20, 2008;

10.    Affirmation of Greg V. Serio, Esq., dated May 21, 2008;

11.     Reply Affidavit of Kelly Mooney Lester, Esq., dated May 22. 2008, with Exhibit A annexed;

12.     Reply Affidavit of Richard S. Flaherty, sworn to May 21, 2008, with Exhibits A-I annexed;

13.     75 Trustee Affidavits;

14.     Affirmation of Stephen P. Younger, Esq., dated May 21, 2008, with Exhibits A-I annexed;

15.     Petitioners' Reply Memorandum of Law, dated May 22, 2008;

16.     Letter of Richard Lombardo, Assistant Attorney General, dated May 7, 2008, with fifteen unmarked exhibits annexed;

17.     Five unmarked exhibits submitted by petitioners' at oral argument on May 23, 2008;

18.     Letter of Richard Lombardo, Assistant Attorney General, dated May 30, 2008;

19.     Letter of Kenneth A. Manning and Kelly Mooney Lester, Esqs., dated June 2, 2008;

20.     Letter of Richard Lombardo, Assistant Attorney General, dated June 25, 2008, with Exhibits A-C annexed;

21.     Letter of Stephen P. Younger, Esq., dated June 27, 2008, with Exhibits A-D annexed;

22.     Letter of Hermes Fernandez, Esq., dated June 30, 2008;

23.     Letter of Hermes Fernandez, Esq., dated July 1, 2008, with one unmarked exhibit annexed;

24.     Letter of Stephen P. Younger, Esq., dated July 1, 2008, with Exhibit A annexed;

25.     Letter of John P. Calareso, Jr., Esq., dated July 1, 2008;

26.     Letter of Richard Lombardo, Assistant Attorney General, dated July 2, 2008.